IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 OCT 25  A 11: 29

U.S. DISTRICT COURT
DISTRICT OF MASS.

)
DEBORAH J. BARNES, individually )
and for all others similarly situated, )
)
   Plaintiff, )
)
v. )   CIVIL ACTION NO. 01-10395-NG
)
FLEET NATIONAL BANK and )
FLEETBOSTON FINANCIAL )
CORPORATION, )
)
   Defendants, )
)

### OBJECTION OF COLMAN M. HERMAN
### TO PROPOSED CLASS-ACTION SETTLEMENT

The Cy Pres Distribution

With regard to the distribution of *cy pres* money in this case, the settlement agreement (p. 5) states the following:

> If any monies are not distributed because certain Settlement Class members do not submit claims and after the payment of attorneys' fees and costs to Barnes' counsel and the incentive payment to Barnes, and after Fleet has been fully reimbursed for the cost of printing, mailing and publishing the Notices and administering the Settlement, there shall be a *cy pres* distribution of the remaining funds (split equally) to City Year National, Greater Boston Legal Services and the National Consumer Law Center . . . .

It is inappropriate to designate City Year National as a recipient of *cy pres* money in this case for three reasons:

1. City Year National has nothing to do with consumerism, which is at the core of this case;

2. It may be a paper transaction in that Fleet/Bank of America already gives money to City Year National; and

3. There is a conflict of interest present, i.e, City Year National is a customer of Bank of America.

I will expound on each of these issues.

<u>City Year is not a Consumer Organization</u>. Both the National Consumer Law Center and Greater Boston Legal Services represent excellent choices as recipients of *cy pres* money in this matter. But the same certainly cannot be said for City Year National. Giving *cy pres* money in this, a hardcore consumer case, to City Year National, although apparently a fine organization, is not what the notion of *cy pres* is all about -- the "next best use" of settlement money when, for various reasons, some or all of it is not going directly into the pockets of the actual victims who were harmed. Clearly, there is no nexus here between City Year National and the issues addressed by the settlement. That is to say, City Year National has nothing whatsoever to do with consumerism. In support of my argument here, I offer the following.

Jill Claybrook, President of Public Citizen, recently wrote: "In recent years the courts have been more carefully examining how cy pres funds are being used, which means that there must be a close fit between the conduct at issue in the lawsuit and the purpose to which the cy pres money is being devoted" (Exhibit 1).

Another consumer advocate, Patricia Sturdevant, Executive Director and General Counsel of the National Association of Consumer Advocates, added:

> ... [D]efendants ... often ... seek to avoid awards that encourage advocacy and instead urge some innocuous charitable organization as a recipient. ... [*Cy pres* funding] should be based on the legal prerequisite of a nexus between the proposed use of the fund and indirect benefit to ... class members or furtherance of the purposes of the statutes on which the underlying case was litigated. Charitable organizations which do not satisfy the nexus requirement are simply inappropriate recipients under the case law because of the lack of benefit to ... class members, <u>regardless of how worthy they might be</u> [emphasis added]. (Exhibit 2)

The Massachusetts Public Interest Research Groups (MASSPIRG) holds the same views, as evidenced by the objection (Exhibit 3), dated August 9, 2004, the organization submitted in <u>Sullivan et al. v. Walgreens</u> (Docket No. 04-2524-BLS, Massachusetts Suffolk Superior Court), a case dealing with the pricing of merchandise.[1] The words of

---

[1] Although MASSPIRG subsequently withdrew its objection, it words nonetheless have significant merit here. Moreover, four months later, MASSPIRG sent a letter (Exhibit 4) dated August 9, 2004 to the plaintiffs' counsel in the Walgreens case in which it continues to make the same exact arguments as to how *cy pres* funds should be distributed.

MASSPIRG are so compellingly on point here that I will quote extensively from its submission.

> [MASSPIRG] . . . object[s] to the distribution of large portions of Defendant Walgreen Eastern Co., Inc's ('Walgreens') settlement payment to organizations whose purposes and activities have nothing whatsoever to do with the alleged violations at issue in the case or with the common interests of the proposed Settlement class. . . .
>
> In addition to considering the rights of members of the class who were not involved in the settlement negotiation, courts must also consider the "interests of the public as a whole":
>
>> The substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established. In such cases, the ramifications of a settlement can extend far beyond the rights of individual class members. The public interest is present not only in civil rights suits such as the one now before us, but also in such economic litigation as antitrust and consumers' rights actions [emphasis added]. Uncritical acceptance of a class action settlement can, therefore, disturb important national policies beyond the immediate impact upon the rights of class members. [Armstrong v. Board of School Directors of Milwaukee, 616 F.2d 305, 313 (7th Cir. 1980).]
>
> In deciding how to distribute funds paid pursuant to the enforcement of consumer protection laws, courts should consider whether the allocation plan is consistent with the polices of the underlying statute. Here, both the broader public interest and the interests of the settlement class lie in furthering the purposes of Chapter 93A. . . .
>
> The application of *cy pres* permits distribution to charitable or public service organizations that will use the funds to "[combat] harms similar to those that injured the class members." Jones v. National Distillers, 56 F.Supp.2d 355, 368 (S.D.N.Y. 1999); see also In re Motorsports Merchandise Antitrust Litigation, 160 F.Supp.2d 1392, 1394 (N.D. Ga. 2001). The distribution of settlement funds to charitable or public service organizations serving consumers can prevent future harm of a nature similar to that underlying this suit, thereby best serving the goals of Chapter 93A. . . .
>
> But a significant portion of the [*cy pres*] fund . . . [in the Walgreens case] is devoted to organizations whose purposes and programs neither benefit the settlement class nor further the proposes of Chapter 93A . . . .
>
> The Cy Pres fund is not merely a gift made by Walgreens, to be directed as the company wishes. It is a payment for which the members of the class are paying a significant price: the waiver of any right to pursue further litigation against Walgreens [with regard to the alleged violations of the law] during the class period. Thus, unless the consideration for this broad waiver of legal rights actually provides a benefit to the Settlement

3

Class that is more than purely serendipitous or applicable to society as a whole . . ., and serves the public's specific interest in improving the lot of consumers in the economic marketplace, then the Proposed Settlement cannot be said to be fair, reasonable, or adequate.

Based on the above reasoning, it is clear that City Year National is not a good choice to receive *cy pres* funds in this case because there is no nexus here between City Year National and the issues addressed by the settlement. Accordingly, I respectfully recommend that any *cy pres* money be divided equally between the two other organizations designated to receive such funds, the National Consumer Law Center and Greater Boston Legal Services. But if the court deems this not appropriate, the City Year *cy pres* money should go to the City Year in Boston, not the national organization.

This may be a Paper Transaction. In addition, the giving of *cy pres* money by Fleet/Bank of America to City Year may be a paper transaction, i.e, City Year would have received the money anyhow absent the litigation. In other words, it is money that Fleet/Bank of America would have given to City Year anyhow as part of its general corporate giving program. As evidence of this, City Year's website states the following:

City Year shares a long history with Bank of America and its predecessors. More than 15 years ago, Bank of Boston signed on as a founding sponsor of City Year, Inc., and was the first company in the nation to sponsor a City Year team. . . . . City Year . . . [is] deeply grateful to Bank of America for their landmark support of our programs and the communities we serve. (Exhibit 5)

Accordingly, I respectfully recommend that the *cy pres* money be redirected elsewhere, as suggested above.

There is a Conflict of Interest. Fleet/Bank of America and City Year appear to have an ongoing business relationship, making the giving of *cy pres* money by Fleet/Bank of America to City Year entirely inappropriate. As evidence of this business relationship, City Year's most recent financial statement (Exhibit 6) states that City Year "has a credit facility with Fleet/Bank of America consisting of a line of credit and a note payable." Given that City Year is a customer of Fleet/Bank of America, a conflict of interest exists here, and thus the *cy pres* money should be directed elsewhere, as suggested above.

<u>The Claim Form</u>

I now raise two issues here with regard to the claim form that must be completed by the members of the class in order to get their money: 1) the unnecessary burden of filling out and submitting a claim form, and 2) the signing of a penalty statement,

<u>Unnecessary Claim Form</u>. In order to get their money, class members must fill out and submit a claim form for each of their accounts. This would deter many --if not most - class members from applying to get their money. It seems to me that since Fleet/Bank of America has the addresses of class members, the claims form process is unnecessary, i.e, Fleet/Bank of America could just mail the checks to the class members.

I wrote the above to plaintiff's lead counsel. The following is their response.

> Discovery in this case showed that due to the changeover from BankBoston's computer system to Fleet's, it was not feasible to identify from Fleet's current records exactly which persons were BankBoston customers at the time of the "change in terms" mailing. We are thus using a claim form . . . .

In response, I then asked counsel if they used an expert to help them make that determination. In response, they wrote the following back to me.

> We did not use an expert. Instead we sent confirmatory interrogatories that complemented earlier discovery responses on whether the class members could be specifically ascertained. It would not have been feasible to ascertain the information because Fleet's computers would have had to be reprogrammed, which would have stopped Fleet's other critical operational tasks. The difficulties in the reprogramming were exacerbated by the changeover of computer systems during the merger.

All that is well and good. But the fact remains that plaintiff's counsel did not do sufficient due diligence, and instead relied on what Fleet/Bank of America said. Filling out claims forms will be quite burdensome to class members, and as such, it will undoubtedly cause many of them not to seek out the money due them. Accordingly, I respectfully ask the court to require plaintiff's counsel to retain an expert to confirm or dispute Fleet/Bank of America's claim that it cannot identify exactly which persons were BankBoston customers at the time of the change in terms.

<u>Unwarranted Penalty Statement</u>. The claim form requires class members to sign the following statement.

> I declare under penalty of perjury I had a BankBoston, N.A. checking, regular passbook, statement savings, money market and/or Now deposit account established primarily for personal, family or household purposes and received a "change-in terms" notice from Fleet National Bank in March or April 2000 telling me that my count would become a Fleet account.

I remember receiving the notice because I pay attention to such matters. But the overwhelming majority of the members of the class will not remember, and asking them to sign under the penalty perjury will likely cause many, many of them not to submit a claim form.

I wrote the above to plaintiff's counsel. The following is their response.

> Having class members sign under penalty of perjury is standard on a claim form, and is particularly appropriate in a case like this one, where we know that notice is going out to thousands of persons who are not class members.

But the reality is that when class members sign a claim form under the penalty of perjury, it is usually about something far more recent and far more memorable. Accordingly, I respectfully ask the court to require that notice go out stating that class members do not have to sign the penalty statement in order to receive their money. In contemplating this action, I ask the court to consider the following. Some people may get money they do not deserve, but many more will not get the money they deserve because they have moved since 2000 and will go unaware of the settlement and the money due them.

In addition, guidance from the court is needed as to what consumers should do if they do not remember whether or not they received the change-in-terms notice.

Finally with regard to the claim form, it further seems to me that the it was issued prematurely, and instead should have awaited the findings of the fairness hearing.

ADMINISTRATIVE COSTS OF THE SETTLEMENT

The settlement agreement (p. 5) states the following.

> The Settlement Fund shall be utilized for payments to Settlement Class members who submit valid and timely claims . . . ; attorneys' fees and costs awarded by the Court to Barnes' counsel; an incentive payment to Barnes awarded by the Court; and if any amount is remaining in the Settlement Fund after payment of these items, to reimburse Fleet for the cost of printing, mailing and publishing the Notices and administering the Settlement

The settlement fund is clearly intended to pay class members for the failure of Fleet/Bank of America to provide notice of change in terms, attorneys' fees, and the Barnes' incentive. Everything left over should go to the *cy pres* recipients. To do otherwise is not in the best interest of the class.

Attorneys' Fees

I recently asked plaintiff's counsel how many hours they devoted to the case and am now waiting for a response. I reserve the right to address the amount of these fees at the fairness hearing.

Respectfully submitted,

Colman M. Herman, *Pro Se*
1200 Adams Street
Dorchester, MA  02124
(617) 298-1008

Dated: October 25, 2005

7

## Certificate of Service

I hereby certify that on October 25, 2005 a true copy of the above document was served by first-class mail on the following parties,

Daniel A. Edelman
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street
18th Floor
Chicago, IL 60603

Yvonne W. Rosmarin
Law Office of Yvonne W. Rosmarin
58 Medford Street
Arlington, MA 02474

Joseph L. Kociubes
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

_____
Colman M. Herman, *Pro Se*
1200 Adams Street
Dorchester, MA 02124
(617) 298-1008