UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBORAH J. BARNES, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>FLEET NATIONAL BANK and FLEETBOSTON FINANCIAL CORPORATION,<br><br>        Defendants. | CIVIL ACTION<br>NO. 01 CV 10395 NG |

**DEFENDANTS' MEMORANDUM IN RESPONSE TO OBJECTIONS**

Defendants, Fleet National Bank and FleetBoston Financial Corporation (collectively, "Fleet"), hereby submit this Memorandum in Response to Objections.

**Preliminary Statement**

The proposed settlement before the Court is fair, reasonable and adequate. It is the product of arms'-length negotiations, including mediation before United States Magistrate Judge Judith Dein, during which the principal terms of the settlement were agreed to by the parties, followed by months of further negotiations concerning specific details and language of the settlement agreement.

Although there is no evidence of actual damages (and no actual damages were alleged), the proposed settlement calls for the creation of a $12.5 million settlement fund to satisfy the claims of class members, who are to receive payment on their claims without the delay, burden and substantial risk associated with further litigation. The terms of the settlement are substantively fair to class members, and the settlement is not tainted by collusion, coercion or conflicts of interest.

Nevertheless, four principal objections to the settlement have been filed -- by Nancy Feldman, Colman Herman, David Miller and Victoria Wolfson, (the "Objectors") -- asserting various purported deficiencies in the proposed settlement.[1]  Not only do the Objectors represent a miniscule portion of the class, their arguments are premised primarily on the erroneous contention that the Plaintiff was assured of complete, unmitigated victory if the case were tried and, therefore, should have refused to compromise with Fleet to settle the case.

As demonstrated below, the Objectors grossly overestimate the strength of the Plaintiff's case.  Moreover, they misapprehend the settlement process and the standards for the approval of settlements under Fed. R. Civ. P. 23(e).  As courts have explained: "The essence of settlement is compromise.  Each side gains the benefit of immediate resolution of the litigation and some measure of vindication of its position while foregoing the opportunity to achieve an unmitigated victory." *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Fed. R. Civ. P. 23(e) thus does not entitle class members to the perfect settlement; rather, it assures them of a fair, reasonable and adequate settlement.  The settlement in this case easily meets that standard and should be approved over the challenge of the Objectors.

**The Objections**

The Objectors assert that the settlement is inadequate for the following reasons:

- Counsel for the plaintiffs' class ("Class Counsel") supposedly "sold out" the class in exchange for higher attorneys' fees.  Feldman Obj. at 4; Miller Obj. at 4.

---

[1] Margo Schlanger has also filed an objection, stating that the requirement that the claim form be signed under penalty of perjury is unfair and that she should not have to attend the fairness hearing in order to object to the settlement.  The first objection is addressed herein.  *See infra* Section D.  As to the second, Fleet does not oppose the consideration of Ms. Schlanger's objection without her presence at the hearing.  Dr. Saghir Qureshi made an informal objection to the proposed settlement by sending a letter to the Court.  The objection did not appear on the Court's docket and Fleet had no notice that the objection had been filed.  In any event, the issues raised by Dr. Qureshi's are duplicative of other objections addressed herein.

- The proposed settlement provides for an inadequate settlement fund. Feldman Obj. at 1-3; Wolfson Obj. at 2-6.

- The proposed settlement requires individuals to submit claim forms stating, under penalty of perjury, that they meet the requirements for membership in the class. Feldman Obj. at 5-6; Herman Obj. at 5-6.

- The proposed settlement does not provide for the distribution of unclaimed settlement funds to the most worthy recipients. Feldman Obj. at 6-9; Herman Obj. at 1-4.

The Objectors demand that the settlement be modified to make these terms much more favorable to the class. Their demands are completely unrealistic and go far beyond what is required by Fed. R. Civ. P. 23(e) for the approval of the proposed settlement.

**Argument**

**A.   The Legal Standard**

Under Fed. R. Civ. P. 23, a court should approve a settlement upon finding that its "terms are fair, reasonable and adequate." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 67 (D. Mass. 1997). In making this determination, courts must "consider both the substantive terms of the settlement compared to the likely result of the trial and the negotiating process by which the settlement was reached." *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999). Contrary to the Objectors' contentions, the settlement in this case is both procedurally and substantively fair.

**B.   The Proposed Settlement is Procedurally Fair and, Therefore, is Entitled to a Strong Presumption in Favor of Approval.**

Where a proposed settlement is procedurally fair -- i.e., the product of informed, arms'-length negotiations between the parties -- there is an initial presumption that the settlement is fair, reasonable and adequate. *See City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms length, there is a presumption in favor of the settlement."). The presence of additional factors, such as experienced counsel and a small number of objectors, gives rise to a "strong initial presumption" that the settlement is fair and reasonable. As this Court explained in *Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000):

> The proponents of a class settlement can obtain "a strong initial presumption that the compromise is fair and reasonable" by establishing that the settlement was reached after arms-length negotiations, that the proponents' attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small.

191 F.R.D. at 6 (citation omitted).  In this case, all the necessary factors supporting procedural fairness are present, thereby creating a strong initial presumption in favor of approval of the proposed settlement.  The Objectors have not rebutted any of these factors.

*Arms'-Length Negotiations*:  The proposed settlement was not the product of coercion or collusion, and is not tainted by any conflicts of interest.  To the contrary, the proposed settlement was reached after extensive arms'-length negotiations among the parties, including mediation before United States Magistrate Judge Judith Dein.  Affidavit of Joseph L. Kociubes, ¶ 2.

Objector Feldman contends that Class Counsel "sold the class short for an immediate and assured payment of more than $3 million" in attorneys' fees.  Feldman Obj. at 4; *see also* Miller Obj. at 4.  This is patently false.  The parties did not negotiate, and the proposed settlement does not provide for, any amount of attorneys' fees for Class Counsel.  Instead, Class Counsel must petition the Court for an appropriate award, just as would be required if the case were tried and the Plaintiff prevailed.  Although Fleet agreed not to oppose Class Counsel's petition for fees up to 25% of the settlement fund, the Objectors remain free to oppose -- and have opposed -- the fees requested by Class Counsel.[2]

---

[2]Defendants did not discuss attorneys' fees or agree not to oppose Class Counsel's fee petition up to a maximum of 25% of the settlement fund until *after* all other substantive terms of the proposed settlement were finalized.  Kociubes Aff., ¶ 4.  This clearly militates in favor of a finding that the settlement process was not collusive.  *See*, *e.g.*, *Bussie*, 50 F. Supp. 2d at 77 ("[T]he assurances of the parties that they did not address the issue of Lead Counsel's remuneration until after reaching consensus on the terms of the Settlement also suggests that the settlement process was fair."); *Duhaime*, 177 F.R.D. at 67 (where parties did not discuss attorneys' fees until after the settlement was finalized, there was "no basis for a conclusion that the negotiations were influenced in any way by the question of attorneys' fees").

*Experienced Counsel*:  The Objectors have not challenged the experience of Class Counsel or Fleet's counsel in the prosecution, defense and settlement of the class action litigation.

*Sufficient Discovery*:  The parties engaged in discovery prior to the mediation, including depositions and document production, as well as additional confirmatory discovery during the period between the mediation and the execution of the final settlement agreement.  Kociubes Aff., ¶ 3.  This discovery "was sufficient to permit a reliable assessment of each parties' strengths and weaknesses."  *Duhaime*, 177 F.R.D. at 67.  The Objectors have not questioned the adequacy of discovery.

*Limited Number of Opt-Outs and Objectors*:  The number of requests for exclusion from the settlement and the number of objections filed are relevant to the Court's analysis of the settlement.  *Bussie*, 50 F. Supp. 2d at 77.  Indeed, a "favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval."  *In re Painewebber P'ship Litig.*, 171 F.R.D. 104, 106 (S.D.N.Y. 1997).  Only six objectors have emerged from a pool of over 1,000,000 persons targeted by the class notice.  That is only .0006%.  In addition, only 193 persons had opted out of the class as of November 4, 2005, *see* Affidavit of Sujata Mouck, ¶ 5, accounting for only .019% of the putative class.  Thus, the number of objections to the settlement is *de minimis*, and the reaction of the class to the proposed settlement has been overwhelmingly favorable.  *See Bussie*, 50 F. Supp. 2d at 77 (considering the number of objections to be "*de minimis*" where only .05% of class members requested to opt out of the class and only .003% timely filed objections to the terms of the settlement).

In view of the foregoing, the proposed settlement is entitled to a strong initial presumption of fairness.

C.   **The Proposed Settlement is Substantively Fair.**

Contrary to the Objectors' position, "[i]n evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that

could be made to the plaintiff after full and successful litigation of the claim." *Duhaime*, 177 F.R.D. at 68. This is because a settlement is the result of a compromise, with each party surrendering something in order to avoid the risks and costs inherent in fully litigating a case. *Id.* (citing *Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974)).[3] Moreover, courts should keep in mind that "[a] fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist," and that "'[a] high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes.'" *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 73 (D. Mass. 2005) (citation omitted).

With these principles in mind, there is no question that the proposed settlement is substantively fair. The proposed settlement provides for a $12.5 million fund to satisfy the claims of class members. Each class member who submits a valid claim form establishing his or her membership in the class will almost certainly receive a $25 payment for each Qualified Deposit Account held by him or her -- the maximum statutory damages available under Mass. Gen. Laws ch. 93A ("Chapter 93A"). The only way that class members would receive less than $25 per claim is if class members' claims, Class Counsel's attorneys' fees, and the incentive payment to Barnes exceed $12.5 million. That is very unlikely in this case.[4]

Furthermore, in attacking the adequacy of the $12.5 million settlement fund, Objectors Feldman and Wolfson grossly overstate the strength of the Plaintiff's case. Specifically, the

---

[3]Class members who prefer to litigate in pursuit of total victory are free to opt out of the settlement. *Duhaime*, 177 F.R.D. at 68. In any event, each class member who submits a claim will almost certainly receive the *maximum* statutory damages available under Chapter 93A for each Qualified Deposit Account held by him or her.

[4]Even with Class Counsel's attorneys' fees and Barnes' incentive award coming out of the fund, there should still be substantially in excess of $9 million dollars in the fund to pay class members' claims (assuming approximately $3 million in attorneys' fees for Class Counsel and a $3000 incentive payment to Barnes). It would take 360,000 valid $25 claims to exhaust that $9 million fund. The claim return rate is unlikely to be that high. It is important to note that Fleet has agreed to donate any excess monies in the settlement fund to three worthy charities. Thus, no part of Fleet's $12.5 million payment will be returned to Fleet.

Objectors contend that each class member was virtually certain to recover $25 in statutory damages if the case were litigated instead of settled.  Feldman Obj. at 1-3; Wolfson Obj. at 2-6.  From this, the Objectors conclude that the appropriate settlement fund in this case was at or near $25 million ($25 multiplied by an estimated 1 million persons targeted by the class notice), plus the Class Counsel's attorneys' fees.  *Id.*

The Objectors completely ignore the real and substantial risks that (1) the actual size of the class would be determined to be far smaller than the 1,000,000 members assumed by the Objectors; and (2) the damages awarded to a certified class would have been limited to far less than $25 per class member.  The Objectors also rely on mischaracterizations of the decision of the First Circuit Court of Appeals in *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164 (1st Cir. 2004), and Massachusetts cases interpreting Chapter 93A.

**1.     The Objectors Erroneously Assume that the Class Size Was One Million.**

The Objectors' assessment of the adequacy of the $12.5 million settlement fund is premised upon the assumption that the putative class, if certified, would have included 1,000,000 members.  Feldman Obj. at 1-3; Wolfson Obj. at 2-6.  The 1,000,000 figure is based on the approximate number of BankBoston customers who were sent the change-in-terms notices at issue in this case ("CIT Notices").  Fleet, however, took the position during settlement negotiations that the following five categories of customers who received CIT Notices should be excluded from the class because they were not entitled to the protections of the Truth in Savings Act, 12 U.S.C. §§ 4301, *et seq.* ("TISA"):

- *Customers with non-retail accounts (69,018)***:**  These are non-retail customers for whom a bank branch erroneously opened a retail product type.  For example, a sole proprietor of a business may have opened a personal (retail) account type for his business, rather than a business account type.

- *Non-Massachusetts customers (50,816)***:**  This category includes accounts that were opened in Massachusetts for customers with a non-Massachusetts address.  For example, non-Massachusetts customers might have a Massachusetts account if they moved out of Massachusetts after opening the account at BankBoston, or may have come into Massachusetts to open the account, even though they resided elsewhere.

- *Customers who opened new accounts after 3/16/2000 (18,136)*:  The customers in this category are former BankBoston customers who were not sent the CIT Notices because they opened their accounts after the CIT Notices were mailed, and prior to May 12, 2000. Disclosure of account changes was effected in a different way for these customers.

- *Customers with "policy" waivers (83,841)*:  These customers paid no monthly fees due to a standing monthly-fee waiver, as a matter of Fleet policy.

- *Customers who met minimum balance requirements (210,203)*:  These customers were not eligible for a policy waiver but could still avoid monthly fees by maintaining the minimum balance.

If this case had not settled, Fleet would have asserted that customers in the above categories should have been excluded from any certified class, thus resulting in a class of 584,149 members.  Viewed in that light, the $12.5 million settlement fund comes very close to the maximum class judgment that could have been obtained if a class were certified and a judgment were obtained.

### 2. The Objectors Ignore the Risk that Damages Would Have Been Limited To Far Less than $25 Per Class Member.

Fleet had available to it a number of strong arguments that class members should receive substantially less than $25 each in statutory damages for the Chapter 93A violation, including the following:

*Offset of Damages*:  It is hornbook law that a defendant should be credited with any direct benefits that he or she has bestowed on a plaintiff as a result of, or in the course of, causing an injury.  *See* D. Dobbs, LAW OF REMEDIES, § 8.6(2) at 488-49 (2d ed. 1993); *see also* RESTATEMENT (SECOND) OF TORTS, § 920A (1979) (stating that a "payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability").  Fleet was prepared to argue that, under this broad rule, Fleet's waiver of fees for a full month following the conversion of BankBoston accounts to Fleet accounts benefited all those whose rights under TISA and Chapter 93A actually or potentially were violated.  If Fleet were to prevail on this argument, the fee waiver would have been credited against any liability that Fleet incurred as a result of violating TISA and Chapter 93A and this would have partially

-8-

or completely offset the $25 statutory damages award to which each class member was allegedly entitled.

***Congressional Intent to Limit TISA Damages to $500,000*:**  In 1974, Congress amended the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("TILA"), to limit statutory damages in a TILA class action (or series of related class actions) to the lesser of $500,000 or 1% of the creditor's net worth.  15 U.S.C. § 1640(a)(2)(B).  When Congress subsequently enacted TISA, it included the same class action damages cap in 12 U.S.C. § 4310(a)(2)(B)(ii).  Fleet was prepared to argue that an automatic award of $25 per class member under Chapter 93A, leading to an estimated $25 million exposure, is inconsistent with, and preempted by, Congress's decision to cap statutory damages in TISA class actions at $500,000.[5]

This argument is directly supported by *Hazelaar v. Bank of Am., N.A.*, No. CGC-03-420622, slip op. (Calif. Super. Ct. Jan. 1, 2005) (attached hereto at Exhibit A), which involved the availability of statutory damages in class actions based on the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693, another consumer credit statute with the same class action damages limits as TILA and TISA; and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 and 17500.  The court held that, where a UCL violation is predicated on an EFTA violation, an unlimited recovery of statutory damages under the UCL is inconsistent with, and preempted by, the EFTA's $500,000 cap on statutory damages in a class action.  Slip op. at 8.  In so holding, the court stated that "the cap language in the EFTA reflects a federal policy of [balancing] the rights of class action litigants with the protections of financial services institutions from ruinous exposure for violations of the statute."  Slip op. at 7.  If Fleet were successful in making this argument, the putative class would have been left with a total recovery of $500,000 (plus attorneys' fees).

---

[5] The 2001 repeal of section 4310(a)(2)(B)(ii) eliminated altogether private rights of action for TISA violations.

*Due Process*:  In *Parker v. Time Warner Entertainment Co.*, 331 F.3d 13 (2d Cir. 2003), the Second Circuit expressed concern that awarding a fixed statutory penalty to a class in the absence of proof of actual damages would result in a "devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class."  331 F.3d at 22.  The court observed that, "[i]n general, such awards create an *in terrorem* effect on defendants, which tends to induce unfair settlements."  *Id.*.  Rather than deny class certification altogether, the court determined that Due Process might require a reduction in the statutory award otherwise required.  *Id*.  Given that the United States Supreme Court has held that Due Process generally limits punitive damages to an amount ten times or less than the amount of actual damages, *see State Farm Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003), application of *Parker* to the instant case would have dramatically reduced the class recovery.[6]

*The National Bank Act*:  Fleet was ready to argue that the $25 penalty provided by Chapter 93A could not constitutionally be applied against Fleet, a national bank protected by the National Bank Act, 12 U.S.C. § 21, *et seq*.  Indeed, the statutory damages remedy provided for in Chapter 93A constitutes precisely the type of "unfriendly" legislation that the Supreme Court has regularly refused to apply to national banks.  *See*, *e.g.*, *McCulloch v. Maryland*, 4 Wheat. 316 (1819) (state tax inapplicable to national bank because the power to tax, like the power to impose penalties, is the power to destroy); *First Nat'l Bank v. Missouri*, 263 U.S. 640, 656 (1924) (Federal law preempts state laws that "interfere with the purposes of [national banks'] creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States.").  Successful assertion of this argument could have resulted in a ruling that Chapter 93A damages were not proper at all.

---

[6] The *Parker* court's conclusion that a remittitur of statutory damages would be required by Due Process under appropriate circumstances has been cited approvingly by a number of courts. *See*, *e.g.*, *In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 351 (N.D. Ill. 2000); *Travel 100 Group, Inc. v. Empire Cooler Serv., Inc.*, No. 03 CH 14510, 2004 WL 3106579, at *7 (Ill. Cir. Ct. Oct. 19, 2004) (attached hereto at Exhibit B).

***Lack of Proof of Causation of Injury*:** In *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164 (1st Cir. 2004), the First Circuit held that Fleet's violation of TISA "constitute[d] a *per se* violation of Mass. Gen. Laws ch. 93A, § 2." 370 F.3d at 176. Section 2 of Chapter 93A merely declares what conduct is unlawful under the statute and the First Circuit's decision did not address the question of damages but directed that this Court conduct "further proceedings to determine statutory damages." 370 F.3d at 176.[7] Thus, contrary to the Objectors' position, the First Circuit's decision provides no guidance on the question whether Barnes and other class members may recover statutory damages. Fleet was prepared to argue that two Massachusetts cases decided in 2004 establish that proof of causation of injury is required before statutory damages may be awarded in Chapter 93A cases and, therefore, that Plaintiff's argument that each person who received the CIT Notice is automatically entitled to receive a $25 statutory damages award under Chapter 93A should be rejected.

The Massachusetts Appeals Court, in *Lord v. Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309 (2004), *rev. denied*, 441 Mass. 1104 (2004), concluded that the Massachusetts Legislature did not intend Chapter 93A's $25 statutory damages award "to be an automatic award whenever an unfair or deceptive act or practice has been identified" and held that, while a statutory damages award "may be made when there has been a showing of causation of loss without quantification, it is not available absent a finding of at least some causation of injury." 60 Mass. App. Ct. at 322 (internal citations omitted).

---

[7]The Objectors mischaracterize footnote 11 of the First Circuit's decision, asserting that it somehow constitutes a finding that Barnes and the class are each entitled to $25 in statutory damages. Footnote 11, in context, merely recites the damages schemes provided by TISA and Chapter 93A § 3.

-11-

The Appeals Court explained:

> We do not believe that the Legislature intended the $25 figure to be an automatic award whenever an unfair or deceptive act or practice has been identified. While a $25 award may be made when there has been a showing of causation of loss without quantification, it is not available absent a finding of at least some causation of injury.

60 Mass. App. Ct. at 321-22 (internal citations, quotations, and original alterations omitted).

*Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 813 N.E.2d 476 (2004), relied on by the Objectors, further supports Fleet's position that an award of Chapter 93A statutory damages is not automatic. In *Aspinall*, the Supreme Judicial Court of Massachusetts *specifically endorsed* the holding of the Appeals Court of Massachusetts in *Lord* regarding the need to prove causation of injury in order to recover statutory damages:

> The Appeals Court [in *Lord*] vacated the award based on its conclusion that "the Legislature, in enacting and amending [section 9 of Chapter 93A] did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney's fee recovery." *We agree with this observation*. It states nothing more than what our own decisions have made perfectly clear -- causation is a required element of a successful G.L. c. 93A claim.

813 N.E.2d at 491 (emphasis added). Thus, the Massachusetts Supreme Judicial Court has expressly acknowledged that proof of causation of injury is an essential element for recovery under Chapter 93A.[8]

Had Fleet prevailed on its argument that the *Lord* and *Aspinall* decisions establish that an award of Chapter 93A statutory damages is not automatic based upon a violation and that proof of causation of injury is required, the class recovery in this case would have been dramatically reduced. Indeed, given Fleet's arguments that the incurrence of fees constitutes the only damages that putative class members possibly could have suffered as a result of the violation

---

[8] Contrary to the contention of Feldman, *see* Feldman Obj. at 3, the only aspect of the *Lord* decision rejected in *Aspinall* was the *Lord* court's finding that *Leardi* was limited only to landlord-tenant cases. *See Aspinall*, 813 N.E.2d at 491.

-12-

found by the First Circuit, and that Fleet's fee waiver compensated any and all putative plaintiffs for any such damages, there may have been no class recovery at all.

In sum, the risk that Fleet would have prevailed on one or more of these arguments could not reasonably have been ignored or discounted by Class Counsel. Class Counsel understood and assessed this risk, and very reasonably determined that the best option was to settle the case for $12.5 million. The Objectors' position that Class Counsel should have settled the case for a sum at or near $25 million has no merit and should be rejected by the Court.

### D. The Objectors' Opposition to Claim Forms and the Notice Method is Without Merit.

Objectors Feldman and Herman take issue with the requirement that individuals submit claim forms to establish their membership in the class. Feldman Obj. at 5-6; Herman Obj. at 5-6; Schlanger Obj. at 1. Feldman asserts, with absolutely no support, that "relatively few [class members] will recover anything due to the requirement that they fill out and return a Claim Form that must be signed under the pains and penalty of perjury." Feldman Obj. at 5. Herman calls the form "an unnecessary burden" and asserts that it "would deter many -- if not most -- class members from applying to get their money." Herman Obj. at 5. These conclusory statements are contradicted by the facts, and, in any event, Fleet is entitled to require individuals to prove membership in the class as a prerequisite to their sharing in the settlement fund.

On August 15, 2005, Fleet sent out 724,338 notices to potential class members via U.S. Mail ("Class Notices"). Mouck Aff., ¶¶ 2, 3. Only a relatively small number of these notices (14,753) were returned as undeliverable. *Id.*, ¶ 4. Of the notices returned as undeliverable, 353 were returned with forwarding addresses and were promptly re-mailed. *Id.* Thus, some 709,938 notices reached potential class members. The Class Notices enclosed claim forms ("Claim Forms") requesting that recipients verify their membership in the class (and entitlement to recovery) by signing a sworn statement that, in March or April 2000, they had a BankBoston account established primarily for personal, family or household purposes, and received a "change-in-terms" package from Fleet. Mouck Aff,. ¶ 6; Settlement Agreement at 6 & Ex. C.

-13-

Of the over 700,000 individuals who received Claim Forms, only twelve or so called to inquire about the penalty-of-perjury provision. Mouck Aff., ¶ 6. Only three objections addressed the provision. Moreover, some 58,000 individuals have already returned signed Claim Forms, *id.*, ¶ 7, and the deadline for submitting the forms does not expire until January 16, 2006, *id.*, ¶ 8. This contradicts Feldman's naked assertion that the "daunting hurdle" of signing the forms under oath would reduce the percentage of claimants to "less than 3%." Feldman Obj. at 5.

Furthermore, requiring individuals to sign claim forms under penalty of perjury is "important in helping to insure that the settlement fund is distributed to class members who deserve to recover from the fund." *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (holding that "[t]he information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds") (attached hereto at Exhibit C). For this reason, courts have held that requiring individuals to sign an affirmation under penalty of perjury to establish their claims is not objectionable. *See*, *e.g.*, *Mangone v. First USA Bank*, 206 F.R.D. 222, 235 (N.D. Ill. 2001) ("The requirement of an affirmation on the claim form, under the penalty of perjury, from [class members] seeking reimbursement for [a claim] was appropriate and not objectionable.").

In this case, the Claim Forms are necessary and appropriate to determine membership in the class because Class Notices were mailed to thousands of individuals who are not members of the putative class. For example, over 69,000 accountholders who did not establish their accounts primarily for personal, family or household purposes received notice, but do not fall within the definition of the class. *See supra* Section C.1. In addition, notice of the proposed settlement was published a total of 69 times in 23 different newspapers all over eastern Massachusetts, Order at 4-5 & Ex. F, and a Web site was constructed to inform potential class members about the settlement. *See* http://www.changeintermssettlement.com**.** Claim Forms can be obtained directly from the Web site. Consequently, any individual who saw the published notice or came across the Web site can submit a false claim for a share of the settlement fund. The Claim

-14-
LITDOCS/621304.1
LITDOCS/621336.1

Forms, which require individuals to swear under the penalty of perjury that they meet the requirements for class membership, are necessary to prevent such false claims.

It is certainly not unreasonable for Fleet to insist on excluding undeserving individuals through the use of the sworn Claim Forms. After all, Fleet, by agreeing to the settlement, has given up the right to require individuals to carry their burden of proving membership in the class through litigation. This point was acknowledged by the district court in *Mangone*:

> Still other objectors claim that the Settlement is unfair because [Defendant] should bear the burden of establishing which of the Settlement Class Members are entitled to reimbursement. These objections ignore the rule that a plaintiff in a civil lawsuit bears the burden of proving liability and damages in his or her case. Class action status does not alter this basic principle. Thus, *it is not a valid objection that Defendants should bear the burden of proving which Settlement Class Members are or are not entitled to reimbursement*.

206 F.R.D. at 234-25 (emphasis added) (citing cases). Indeed, courts routinely require that individuals submit notarized claim forms to establish membership in a class "to assure that the fund [is] share[d] among proper and deserving claimants." *In re Armored Car Antitrust Litig.*, No. 78-139A, 1979 WL 1688, at *3 (N.D. Ga. Aug.13, 1979) (attached hereto at Exhibit D).

In this case, the proposed settlement requires no notarization of the Claim Forms and no supporting documentation. Thus, contrary to the Objectors' assertions, the claims procedure is not overly burdensome. *Mangone*, 206 F.R.D. at 235 ("Settlement Class Members are not required to submit any documentation with their claim [and] there is no requirement that the form be notarized. Therefore, the claim form is hardly burdensome.").

The Objectors propose that Fleet simply mail out a $25 check to every person who was sent Class Notice. Feldman Obj. at 5-6; Herman Obj. at 5. Although Feldman acknowledges that this would result in a windfall to a number of individuals who are not class members, she contends that it should not matter because so many actual class members will not be compensated because they cannot be located. Feldman Obj. at 6. Feldman and Herman cite no authority for the proposition that payments should be made to a completely undeserving group simply because some members of the deserving group will not claim their share of a settlement.

Feldman's comparison to a *cy pres* distribution, *see id.*, is nonsensical: A *cy pres* distribution goes to a worthy charity, not to individuals who, by chance, are named on an over-inclusive mailing list.

Herman also takes issue with the method used for notifying members of the class, and suggests that Class Counsel should have forced Fleet to endure whatever hardship and expense was necessary to identify and locate all class members. Herman Obj. at 5. The law clearly does not require this, but merely requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). "The type of notice to which a member of a class is entitled depends upon the information available to the parties about that person" and the possible methods of identification." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir.1977). In determining the reasonableness of the effort required, the court must look to the "anticipated results, costs, and amount involved." 552 F.2d at 1099. Fed. R. Civ. P. 23 simply does not require the parties to exhaust every conceivable method of identifying the individual class members.

In this case, it was not feasible to reconstruct the list of former BankBoston customers who received the CIT Notices. Affidavit of Richard L. Buttermore, ¶ 9. To address this problem, the parties agreed to mail Class Notices to former BankBoston customers who still had open checking and savings accounts with Bank of America. *Id.* To reach class members who closed their accounts after they received the CIT Notices, the parties published notices a total of 69 times in 23 different publications throughout eastern Massachusetts during August and September 2005. *See* Order at 4-5 & Ex. F.

The Court approved this method of notification in its Order Preliminarily Approving Settlement and Directing Notice to Class, dated May 9, 2005, expressly finding that it "fully satisfies the requirements of Fed. R. Civ. P. 23 and due process, constitutes the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons

entitled thereto." Order at 4-5. Because the Court correctly applied the law in approving the notice, Herman's objection is without merit.

E.     **The Objectors' Challenge to the Cy Pres Recipients is Without Merit.**

   1.     **The Parties' Choice of Cy Pres Recipients is Entitled to Deference and Should Be Approved Over Objections.**

Objectors Feldman and Herman devote a substantial portion of their respective briefs to attacking the parties' choices of City Year National ("City Year"), Greater Boston Legal Services ("GBLS"), and the National Consumer Law Center ("NCLC") as the recipients of unclaimed settlement funds ("Cy Pres Recipients").[9] These attacks are baseless.

In a settlement context, "the parties have great flexibility in negotiating an agreement concerning how any unclaimed balance of an aggregate class recovery should be distributed." 3 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 10:15 (4th ed. 2002). "[W]here the parties agree on the distribution of unclaimed class funds, the court should defer to that method of distribution." *Mangone*, 206 F.R.D. at 230; *see also* Kevin M. Ford, *What Can a Court Do with Leftover Class Action Funds? Almost Anything!*, 35 NO. 3 Judges' J. 19, 44 ("To expedite the distribution of undistributable or unclaimed funds, the parties can include in their settlement agreement a provision that unclaimed funds will go to a designated charity . . . . This provision of the agreement should be respected by the courts.").

Thus, contrary to the Objectors' position, Fleet and Plaintiff had great flexibility in choosing who would receive unclaimed settlement funds and were not bound to choose organizations whose charitable purposes were closely related to the subject matter of the litigation. As Newberg explains: "Distributions of unclaimed class funds to organizations whose functions are unrelated, even to confer benefits indirectly on injured class members, have

---

[9] Although Feldman objects to all three Cy Pres Recipients, Herman refers to Greater Boston Legal Services and the National Consumer Law Center as "excellent choices," and opposed only the designation of City Year National. Herman Obj. at 1-4.

been recognized as proper by trial and appellate courts, when the terms of a class settlement so provide." Newberg § 10:25; *see also Weddle v. Frito-Lay, Inc.*, No. C-99-05272-PJH, 2001 WL 182374, at *3 (N.D. Cal. Feb. 21, 2001) (approving parties' agreement to distribute unclaimed settlement funds to the YMCA of the USA , the YWCA of the USA, and The Special Olympics -- three organizations with no relationship to the plaintiffs' claim that Frito-Lay's commission-based compensation programs violated the Fair Labor Standards Act) (attached hereto at Tab E). None of the cases cited by the Objectors involve or apply to *cy pres* recipients designated directly by the parties in their settlement agreement.[10]

In short, there can be no serious dispute that the Cy Pres Recipients are all legitimate, worthy charities. Thus, there is no basis for the Court to second-guess their designation by Fleet and Plaintiff as Cy Pres Recipients.

### 2. Herman's "Paper-Transaction" and Conflict-of-Interest Objections are Baseless and Should Be Disregarded by the Court.

Objector Herman complains that City Year is an inappropriate Cy Pres Recipient because "the giving of cy pres money by Fleet/Bank of America to City Year may be a paper transaction, i.e., City Year would have received the money somehow absent the litigation." Herman Obj. at 4. This wild speculation on the part of Herman hardly deserves a response. The Bank of America Foundation (the "Foundation") is involved with thousands of non-profit organizations nationwide and makes donations to them totaling hundreds of millions of dollars annually. Affidavit of Deirdre Martin, ¶ 7. The Foundation's direct donations to City Year over the last four years have accounted for a relatively small portion of its total direct annual contributions to non-profit organizations in Massachusetts. *Id.*,¶¶ 3-6.

---

[10] Even if the parties were held to the same standards as courts, the *cy pres* doctrine has become more flexible in recent years, allowing the distribution of funds for any public interest purposes. *See Superior Beverage v. Owens-Illinois*, 827 F. Supp. 477, 478 (N.D. Ill. 1993).

The proposition that, among all of the charities to which it donates money, the Foundation chose City Year as a Cy Pres Recipient to save itself the trouble of having to make actual donations to that organization for several years is completely untrue, not to mention absurd.  Fleet categorically denies that the designation of City Year as a Cy Pres Recipient was a device to replace charitable donations otherwise planned for City Year.  Martin Aff., ¶ 9.

Herman's further argument that City Year is an inappropriate Cy Pres Recipient because it has a banking relationship with Bank of America (the "Bank") also is absurd.  The documents attached to Herman's objection suggest that, at some point in the past few years, City Year had a $5 million credit facility with, and an outstanding note payable to, the Bank.  Herman Obj., Ex. 6.  Assuming for the sake of argument that the information in Herman's Exhibit 6 is accurate, it hardly supports the existence of a conflict of interest with the Bank.  The Bank had over $193 billion in outstanding commercial loans and leases at the end of 2004.  *See* Bank 2004 Annual Report, Statements & Notes, Note 6, available at http://www.bankofamerica.com/annualreport/2004/backmatter/cfsn/cfsn_note 6.cfm.  It is not credible to suggest that the Bank's decision to designate City Year as a Cy Pres Recipient was in any way influenced by the relatively small amount of business that the Bank receives from the organization.  The Foundation supports City Year because City Year's stated purpose of promoting the concept of national service as a means of building a stronger democracy is consistent with the Foundation's mission of providing support to non-profit organizations that demonstrate excellence in improving neighborhoods and communities.  Martin Aff., ¶ 8.

As for City Year, its income tax return from 2002 indicates that it received some $22 million in donations from non-governmental entities that year.  *See* Martin Aff., Exhibit A at 1.  In 2002, the FleetBoston Financial Foundation (since merged into the Foundation) donated a total of $5,878 to City Year.  Martin Aff., ¶ 4.  Thus, City Year apparently has a number of donors and is not reliant upon the Bank for a substantial portion of its funding.

Overall, there is simply no support for a conclusion that the two entities have an unusually close relationship that would render inappropriate the designation of City Year as a Cy Pres Recipient. Thus, Herman's objection should be disregarded.

## Conclusion

For the foregoing reasons, the Court should overrule the Objections and approve the settlement.

Respectfully submitted,

**FLEET NATIONAL BANK and FLEETBOSTON FINANCIAL CORPORATION,**

By their attorneys,

___/s/ Rheba Rutkowski_____
Joseph L. Kociubes, BBO# 276360
Rheba Rutkowski, BBO # 632799
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA  02110 (617) 951-8000

*Of Counsel*

Alan S. Kaplinsky
**BALLARD SPAHR ANDREWS & INGERSOLL, LLP**
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

Dated:  November 7, 2005            *Admitted Pro Hac Vice*