**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DEBORAH J. BARNES** )<br>    **Plaintiff,** )<br> )<br>          v.          )<br> )<br>**FLEETBOSTON FINANCIAL CORP.,** )<br>**and FLEET NATIONAL BANK, N.A.,** )<br>    **Defendants.** ) | C.A. No. 01-10395-NG |

**GERTNER, D.J.:**

## MEMORANDUM AND ORDER APPROVING CLASS ACTION SETTLEMENT
### December 22, 2005

Deborah J. Barnes ("Barnes") originally initiated this action against FleetBoston Financial Corp. ("Fleet"), claiming that Fleet had violated the Truth in Savings Act ("TISA"), 12 U.S.C. §§ 4301, *et seq.*, when it sent customers a "Change in Terms" package in March and April of 2000. The First Circuit found that Fleet was liable under state and federal law, see Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164 (1st Cir. 2004), and remanded the case to this Court for class certification and a determination of statutory damages. Barnes and Fleet Bank entered into a settlement agreement on April 26, 2005, and this Court granted preliminary approval of that settlement on May 9, 2005. In so doing, the Court noted "[t]he settlement agreement was the product of arms-length negotiations before a neutral mediator as well as between and among the parties counsel." Additionally, the Court noted that the settlement would produce real benefits to the class and "plainly" met the requirements set forth in Fed. R. Civ. P 23(a) and (b)(3).

The settlement agreement comprises the following terms:

- Creation of a $12.5 million settlement fund.
- Payment of $25 to all class members who complete and timely file a claim. An additional $25 payment for each "Qualified Deposit Account" held by a member of the settlement class (limit of one claim per account). If the total amount of claims submitted, including attorney's fees, exceeds $12.5 million, claims will be paid pro rata, from the $12.5 million.
- Fleet will send notice to all current customers of the settlement and will also place newspaper advertisements.
- Barnes requests a discretionary sum of $3,000 for her role as class representative.
- Attorney's fees equal to their out-of-pocket expenses and an amount not to exceed 25% of the Settlement Fund.
- The release of all claims by parties who do not timely exclude themselves from the class.
- Fleet maintains the right to terminate the settlement if more than 5,000 class members opt out.
- Fleet will cover all costs relating to the provision of proper notice to affected parties.
- Any remaining funds will be split equally between City Year National, Greater Boston Legal Services, and the National Consumer Law Center.

At the final hearing, a court is obliged to review a proposed settlement to evaluate the merits of the claims and defenses. What are the class claims? How strong are they? What is the range of possible values for a successful claim? How likely is the class to succeed on each claim in further litigation, including trial? Is the settlement fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered?

The parties' submissions assisted the Court in assessing the probability of plaintiffs' success and understanding the realistic range of possible outcomes. I have accepted plaintiffs' view. I am thoroughly aware of the merits of the case. The case was vigorously litigated by the parties. My determination that the case should be dismissed was reversed by the First Circuit in a decision cogently outlining its strengths and weaknesses. This settlement followed after extensive, arms-length mediation before Magistrate Judge Dein.

There have only been six objectors out of a pool of over one million targeted by the class notice, and only 193 class members have opted out thus far. All were permitted to fully voice their objections, although some objections clearly fit the description outlined in O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 295 (E.D. Pa. 2003)(quoting Shaw v. Toshiba American Information Systems, 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000)("canned

objections filed by professional objectors who seek out class actions simply to extract a fee by lodging generic, unhelpful protests." )

Notwithstanding these concerns, I have considered each and every objection.

1. Some objectors protest because the proposed settlement requires claimants to swear under penalty of perjury that they received the "Change in Terms" form in March or April of 2000. Fleet counters that it has received only twelve phone calls about the penalty of perjury provision in the settlement agreement and that 58,000 individuals have already returned their claim forms despite the fact that they have until January 16, 2006, to do so. Additionally, Fleet argues that requiring claimants to file the forms under penalty of perjury is necessary because the means of providing notice in this case has ensured that many thousands of individuals who are not entitled to file claims will see the notice and could, in theory, file claims.  The penalty of perjury provision, Fleet argues, is a reasonable means of weeding out claims that lack merit.  I find that it is entirely appropriate to require that degree of formality before claims can be made. The alternative -- no gatekeeping or attempting to confirm with business records -- is untenable.

2. The objection that the wording of the settlement implies that one must attend the hearing in order to make an objection is without merit.

3. Some objectors challenged the fact that the proposed settlement was not fair, reasonable, or adequate compared to what claimants were likely to have received. These objectors argue that lead plaintiff has settled the case for less than 50% of the case's maximum value, a sum further diminished by the subtraction of attorneys' fees.

This position is also without merit. First, the proponent of a class action settlement can obtain "a strong initial presumption that the compromise is fair and reasonable" by establishing that the settlement was reached after arms-length negotiations, that the proponent's attorneys have experience in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small. Id. at 6.

There was no conflict of interest, alleged or otherwise, and the settlement was reached after extensive arms-length discussion between the parties, including mediation before Judge Dein.

With respect to the merits, the issue is not what the plaintiffs could have received had they gotten everything they wanted at a successful trial, but what percentage of the total fairly reflects the difficulties of the litigation and the

probability of success.[1]  Rolland v. Cellucci, 191 F.R.D. 3 (D. Mass. 2000), for example, notes that:

The objectors erroneously assume that the class size would be one million in calculating what they believe to be a fair settlement.  Fleet notes that this figure is based on the approximate number of customers who were mailed change-in-terms notices, and that during settlement talks Fleet disputed the inclusion of many of these individuals in the settlement class.  In particular, Fleet highlighted five subclasses of individuals that it believed should be excluded from the larger class, whittling the class size down to 584,419 members.

In addition, Fleet argues that the objectors ignore the real risk that damages would have been limited to less than $25 per class member.  In support of this position, Fleet argues that the damages in this case could have been offset by Fleet's expenditures on fee waivers shortly after the merger, though Fleet cites no case law in support of this proposition.  Fleet next argues that there was a Congressional intent to limit TISA damages to $500,000 and that if it had succeeded with this argument, the class would have been limited to a $500,000

---

[1] Plaintiff asserts that Fleet may have argued that 1) Chapter 93A requires proof of actual damages; 2) it had already provided compensation to the Settlement Class by waiving fees for a month; 3) the TISA remedy of up to $500,000 preempted any remedy available under Chapter 93A; and 4) the due process clause and National Bank Act preclude the Court from awarding damages under Chapter 93A.  An objector contests the Chapter 93A point, that actual injury is not necessary, and the class is entitled to $25 per violation.  The issue is not entirely clear.  As such, it provides another basis for discounting the settlement figure.

settlement. Further, Fleet argues that the due process clause might require a smaller award, citing to Parker v. Time Warner Entertainment Co., 331 F.3d 13 (2d Cir. 2003). Finally, Fleet claims that it would have argued that damages against the bank were prohibited by the National Bank Act, see McCulloch v. Maryland, 4 Wheat 316 (1819); First National Bank v. Missouri, 263 U.S. 640, 656 (1924), and that there was a lack of proof of causation that may have undermined plaintiffs' claims.

4. With respect to the attorneys' fees, defendant notes that there is no provision guaranteeing attorney's fees in the settlement agreement – only the stipulation that Fleet would not object to a settlement agreement as high as 25% of the total pot. The Court maintains discretion over the size of the fee award.

I note the extraordinary work that plaintiffs' counsel has performed in this case, mastering the material, and doggedly pursuing it before this Court in multiple hearings, and before the Court of Appeals. Furthermore, I note that both the Supreme Court and the First Circuit have expressed approval for a percentage of the fund ("POF") approach in determining attorneys' fees in the context of common fund lawsuits. See Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); In re: Thirteen Appeals, 56 F.3d

295, 305 (1st Cir. 1995) (explaining that while the lodestar approach is well-entrenched in cases involving fee-shifting statutes, courts often turn to a POF approach in common fund cases). I also find the 25% figure proposed by the plaintiffs to be eminently reasonable. "The traditional 'percentage of the common fund' approach involves an award of a percentage-- typically 20-30%-- of the common fund generated by the settlement." Mazola v. May Dep't Stores Co., 1999 WL 1261312 (D. Mass. 1999). In this case plaintiffs' request falls exactly in the middle of the "typical" range and plaintiffs' efforts have been, at the very least, typical, and quite likely much more substantial than that.

I have resolved all matters with the sole exception of the cy pres provision in the settlement. Objectors have challenged the selection of City Year as one of the recipients and this Court has a conflict of interest with respect to City Year. Accordingly, the Court recuses itself from this issue. The matter will return to the usual draw to be resolved by another judge.

I therefore approve all aspects of this settlement with the exception of the cy pres provision [Settlement Agreement § 3]. That issue will be resolved by another judge.

**SO ORDERED.**

**Dated: December 22, 2005**     **s/ NANCY GERTNER U.S.D.J.**