**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

DEBORAH J. BARNES, on behalf of herself and )
all others similarly situated, )
                    Plaintiff, )
                     )
              v. )        01-10395  NG
                     )        Judge Gertner
FLEET NATIONAL BANK, N.A., )
                Defendant. )

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION**
**TO REQUIRE OBJECTOR FELDMAN TO POST APPEAL BOND**

      Objector Nancy Feldman, represented by her son-in-law, John Pentz, hereinafter referred to

together as "Feldman/Pentz," has filed a second notice of appeal of this Court's June 14, 2006 Final

Judgment approving the parties' settlement in this class action.  Feldman/Pentz's first appeal was

dismissed as premature.

      Because the proposed appeal will damage the class members who returned claim forms by

delaying their settlement funds and because any possible basis for this appeal is frivolous, plaintiff's

counsel respectfully requests that Feldman/Pentz be required to post bond for at least $675,111.60,

pursuant to Fed. R. App. P. 7.  This amount includes interest damages for delay in the use of the money

from the judgment as well as attorney's fees and costs for this appeal.

**I.**        **An Appeal Bond Is Appropriate in This Case**.

      Any appeal of the approval of the settlement will be substantively baseless.  Under Fed. R. Civ.

P. 23(e), a district court has broad discretion to determine whether a class action settlement is fair,

adequate, and reasonable, based on the law, facts and circumstances of the case.  It is well-established

that the standard for appellate review of this Court's fee award is abuse of discretion. <u>See</u> <u>In re</u>

<u>Thirteen Appeals</u>, 56 F.3d 295 (1st Cir. 1995); <u>In re Fidelity/ Micron Sec. Litig.</u>, 167 F.3d 735, 737

(1st Cir. 1999).

Although Feldman/Pentz has not filed a description of her reasons for the appeal, the scope of

the appeal is limited to issues raised in the district court.  <u>Skolnick v. Harlow</u>, 820 F.2d 13, 14 (1st

Cir. 1987) (summarily rejecting two of appellant's three issues on appeal because the issues "were not

brought to the attention of the district court.").  The Feldman/Pentz objection in the district court relied

upon reasoning that had been previously rejected by the First Circuit, and this Court acted well within

its discretion in rejecting the boilerplate objections.

Rule 7 of the Federal Rules of Appellate Procedure provides:

> In a civil case, the district court may require an appellant to file a bond or provide other
> security in any form and amount necessary to ensure payment of costs on appeal.

"The nature and amount of the bond is a matter left to the sound discretion of the district court."

<u>Skolnick v. Harlow</u>, 820 F.2d 13, 15 (1st Cir. 1987); <u>see also</u> <u>Adsani v. Miller</u>, 139 F.3d 67, 79 (2d

Cir. 1998) ("[A] district court, familiar with the contours of the case appealed, has the discretion to

impose a bond which reflects its determination of the likely outcome of the appeal.").

The First Circuit has adopted a liberal interpretation of "costs on appeal" under Rule 7 to

include damages that are incurred as a result of the delay associated with an appeal, attorney's fees and

double costs under Fed. R. App. P. 38, and other costs as delineated in Fed. R. App. P. 39.

<u>Skolnick v. Harlow</u>, 820 F.2d 13 (1st Cir. 1987).  Sanctions under 28 U.S.C. § 1927 for conduct

that "multiplies the proceedings ... unreasonably and vexatiously" are also taxable on appeal.  <u>Cronin v.</u>

<u>Town of Amesbury</u>, 81 F.3d 257, 262 (1st Cir. 1996).   Such sanctions may appropriately be

considered in setting the amount of any bond in this case because imposition of § 1927 sanctions require only a finding that an attorney's conduct is "unreasonable and harassing or annoying" judged from an objective standard  —  whether or not the attorney intends to harass or annoy.  McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d 26, 44 (1st Cir. 2002).  Certainly the groundless appeal filed by Feldman/Pentz is unreasonable, harassing and annoying to the class members, the courts and the parties.

It is fairly common for the District Court to require objector appellants or their counsel to post bond in large class action settlements.  For example, in In re Compact Disc Minimum Advertised Price Antitrust Litig., No. MDL 1361, 2003 WL 22417252, *3 (D. Me. Oct. 7, 2003), the district court required Hannah Feldman, who was represented by Mr. Pentz, to post a bond because that appeal "might be frivolous," and because imposition of sanctions on appeal pursuant to Rule 38, was "a real probability."  The court specifically concluded that a bond for "damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in a Rule 7 bond." Id.  Mr. Pentz and Hannah Feldman voluntarily dismissed their appeal thirteen days later.  (Docket item number 325).  Other courts, too, have had similar reactions to frivolous appeals by objectors.  E.g. In re Cardizem CD Antitrust Litig., No. 99-md-1278, Corrected Order No. 82 at 12 (E.D. Mich. Dec. 18, 2003) (**Exhibit A**) (requiring bond of $174,429.00, and holding that, "Attorney fees are also properly included as costs in the request Rule 7 appeal bond."), aff'd, 391 F.3d 812 (6th Cir. 2004) (later opinion required $320,805 bond for subsequent appeal, Nov. 10, 2005) (**Exhibit B**); In re Broadcom Corp. Sec. Litig., No. SACV 01-275 DT (N.D. Cal. Dec. 5, 2005) (**Exhibit C**) (requiring objector's attorney to post bond of $1,240,500, holding that "the costs of delay are properly included in a Rule 7 bond because distribution of the settlement proceeds will be unnecessarily delayed until the

appeal is exhausted." Id. at 6. (Internal punctuation omitted)); In re NASDAQ Market Makers

Antitrust Litigation, 187 F.R.D. 124 (S.D.N.Y. 1999) (bond of $101,500 required);  In re Heritage

Bond Litigation, MDL No. 1475, 2005 WL 2401111 (C.D. Cal. Sept. 12, 2005) (**Exhibit D**) (bond

of $228,000 required).

That objector Feldman's counsel, John Pentz, is a serial, "professional" objector weighs in

favor or requiring a bond.  In Sckolnick, 820 F.2d at 15, the First Circuit affirmed the district court's

requirement that appellant obtain a bond, explicitly noting "that defendants introduced evidence below

that a plaintiff is a litigious *pro se*  who has filed numerous lawsuits in state court."

### A.      Feldman/Pentz's Objections to the Settlement are Frivolous.

Because Feldman/Pentz have no colorable arguments for their appeal, it is likely that double

costs and attorney's frees will be entered.  Based upon the objection Feldman/Pentz filed, the possible

grounds for this appeal are addressed below.

### 1.      Settlement Amount Compared to Likely Recovery at Trial

Feldman/Pentz's objection essentially accuses plaintiff's counsel of "selling out,"  accusing

counsel of "manufacturing a weakness" in her case, in an alleged attempt to "railroad" what was, in

Feldman/Pentz's eyes, an inadequate settlement.  This contention is completely without merit.

Indeed, plaintiff's counsel exercised great diligence in making the judgment as to what

settlement amount was reasonable.  As this Court recognized in its order approving the settlement,

there were several credible legal arguments Fleet was prepared to assert which, if successful, could

have resulted in no recovery for the class.  The only Fleet argument Feldman/Pentz challenged in their

objection was whether a plaintiff must prove causation in order to recover statutory damages under

M.G.L. ch. 93A.   Feldman/Pentz could not have been more wrong.

On January 17, 2006, the Massachusetts Supreme Judicial Court, in <u>Hershenow v. Enterprise Rent-A-Car Co. of Boston</u>, 445 Mass. 790 (Mass. 2006), held that "a plaintiff seeking a remedy under G.L. c. 93A § 9, must demonstrate that even a *per se* deception caused a loss." <u>Id.</u> at *19-20. <u>Hershenow</u> could have presented a substantial obstacle to plaintiff's obtaining anything close to this settlement had it been decided even a few months earlier.

In other words, had plaintiff not settled when she did, the hundreds of thousands of class members might, at best, be splitting $500,000 under the Truth in Savings Act, 12 U.S.C. §§ 4301, *et seq* ("TISA"), rather than the $12.5 million they obtained in this settlement. On the contrary, counsel exercised sound judgment in settling in light of intimation from lower court decisions suggesting the <u>Hershenow</u> outcome. <u>See e.g.</u> <u>Lord v. Commercial Union Ins. Co.</u>, 60 Mass. App. Ct. 309, 313-14, 801 N.E.2d 303 (2004), (cited in <u>Hershenow</u>, <u>supra</u> at 840 N.E.2d at 538).

### 2.    Attorney's Fees

Feldman/Pentz also objected to attorney's fees. Aside from the fact that this Court's approval is firmly justified under controlling First Circuit law, <u>In re Thirteen Appeals</u>, <u>supra</u>, plaintiff submits that under a reading of <u>Hershenow</u> most favorable to Fleet, this settlement may be ***twenty-five times <u>more</u>*** than the amount for which it might have settled had plaintiff's counsel waited or negotiated for a few months longer. Had Attorney Pentz been the one making settlement recommendations, each class claim might have received only a few pennies rather than $25.

Class counsel's experience and expertise in consumer class actions was essential to ensuring the class got any money at all and any appeal challenging the attorney's fee award would be frivolous under Fed. R. App. P. 38.

### 3.    Claim Form Requirements

In negotiating this settlement, a practical problem became apparent: it was not feasible for Fleet to recreate an accurate list of persons to whom the change-in-terms notice was sent. This not only meant that individual notice could not be sent to each class member, but also that Fleet could not feasibly double-check to ensure that claimants were ever BankBoston customers.

Feldman/Pentz argued that the class funds should just be distributed to everyone to whom the class notice was sent, even though that list both included persons who were not class members and omitted many customers who left Fleet between 2000 and 2005 and to whom an expansive publication notice was directed. In this situation, where there was a valid fear of potential widespread fraud from non-class members who either received the mailed notice or saw the publication notice, it was reasonable to require a claimant's signature under penalty of perjury. Indeed, this Court expressly found that "it is entirely appropriate to require that degree of formality before claims can be made. The alternative — no gatekeeping or attempting to confirm with business records — is untenable." Final Approval Order at 4.

Every case that plaintiff has found discussing the issue is in agreement. In re WorldCom, Inc. Sec. Lit., 02 Civ. 3288, 2004 U.S. Dist. LEXIS 22992, at *44 (S.D.N.Y. Nov. 12, 2004) (specifically finding that signature under penalty of perjury was appropriate; finding not affected by subsequent appeals); County of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1428, 1462 (E.D.N.Y. 1989) (Weinstein, J.); EEOC v. USAir, 6:92-CV-00272, 1994 U.S. Dist. LEXIS 12135, at *50 (M.D.N.C. 1994). This court's approval of the penalty of perjury provision was thoughtful and objectively reasonable. Any appeal on this issue, therefore, would be frivolous.

### 4.      Proposed *Cy Pres* Distribution

The final objection Feldman/Pentz raised is related to the *cy pres* distribution. All of the

arguments asserted on this issue are frivolous. Feldman/Pentz argued that the *cy pres* recipients are

improper, and that the District Court's decision not to follow an unpublished opinion involving the

appropriate *cy pres* recipients when chosen by the court, not the parties, In re Compact Disc Minimum

Advertised Price Antitrust Lit., MDL No. 1361, 2005 U.S. Dist. LEXIS 11332 (D. Maine June 10,

2005), was an error and an abuse of discretion by the Court. Unlike the instant case, In re Compact

Disc did not involve *cy pres* recipients as part of the parties' settlement agreement.  Further,

Feldman/Pentz initially argued that the parties should have given each of the 724,338 persons Fleet

identified as "best estimate" class members a pro rata share of the settlement fund as a credit on their

current Fleet account (except those with business accounts).  Such a notice plan would forsake

thousands of true class members who had moved, and create windfalls for thousands of persons who

were not class members.

     Feldman/Pentz later asserted before Judge Zobel, who decided the issue of the *cy pres*

distributions, that a different distribution scheme was appropriate.  Feldman/Pentz erroneously relied on

Hershenow v. Enterprise Rent-A-Car Co., 445 Mass. 790, 840 N.E.2d 526 (2006); however, that

decision (1) did not address *cy pres* distributions, (2) did not even involve a class action settlement and

(3) was decided after the parties had entered into the settlement agreement and after this Court had

finally approved all but the *cy pres* distribution in this case.  Feldman/Pentz nevertheless argued that

Hershenow  somehow controlled who the *cy pres* recipients in this settlement agreement should be.

According to Feldman/Pentz's illogical arguments, despite the parties' settlement agreement, which

could be rendered null and void if not approved *in toto*, Hershenow meant no class members were

entitled to anything and therefore, the entire settlement fund constituted "*cy pres*" funds.  Then for some

reason, these "*cy pres*" funds should be distributed, not to charitable organizations, but to all persons

who submitted claims, even though, according to Feldman/Pentz, none of these individuals were entitled to any recovery under ch. 93A.

The frivolity of the arguments Feldman/Pentz made to the District Court is highlighted in Feldman/Pentz's further argument that now even business account holders should be included in the recipients of these "*cy pres*" funds. This argument misstated the law under TISA and its implementing regulation, Regulation DD, 12 C.F.R. 230 ("Reg. DD"). The provisions of TISA involved here clearly apply solely to consumers and not to businesses.[1]

Judge Zobel approved the parties' agreement that the *cy pres* funds be split equally among three charitable organizations: City Year National, Greater Boston Legal Services, and the National Consumer Law Center. These entities, approved by this Court, were chosen by the parties after substantial and protracted debate and negotiations. Each of the three suggested organizations are easily identified as worthy charitable organizations. This Court found six years ago that NCLC is "the leading non-profit low income consumer advocacy organization in the country." Mazola v. May Dept. Stores Co., No. 97-10872-NG, 1999 WL 1261312, at *4 (D. Mass. Jan. 29, 1999).

Approving a *cy pres* distribution in a settlement of the parties involves different considerations from those in cases in which the court in the first instance determines the identities of the *cy pres* recipients. In a settlement context, "the parties have great flexibility in negotiating an agreement concerning how any unclaimed balance of an aggregate class recovery should be distributed." 3 Alba

---

[1]    This proposed distribution scheme ignored the $25 cap on payments to any single class member under M.G.L. ch. 93A § 9 and would have paid the entire $12.5 million fund (less attorney's fees) pro rata to anyone who submitted claims. This argument was wholly illogical as well as frivolous. Under Feldman/Pentz's reading of Hershenow  and tortured reasoning, a holding that class members were entitled to no statutory damages under ch. 93A somehow would result in a recovery of much more than the maximum $25 in statutory damages allowable under ch. 93A by class members who submit claims and a distribution to persons not even covered by TISA.

Conte & Herbert Newberg, <u>Newberg on Class Actions</u> § 10:15 (4th ed. 2002).  "[W]here the parties

agree on the distribution of unclaimed class funds, the court should defer to that method of distribution."

 <u>Mangone v. First USA Bank</u>, 206 F.R.D. 222, 230 (S.D. Ill. 2001).  "Distributions of unclaimed class

funds to organizations whose functions are unrelated, even to confer benefits indirectly on injured class

members, have been recognized as proper by trial and appellate courts, when the terms of a class

settlement so provide."  <u>Newberg</u>, <u>supra</u>, §10:25.  <u>E.g.</u>, <u>Weddle v. Frito-Lay, Inc.</u>, No. C-99-05272-

PJH, 2001 WL 182374, at *3 (N.D. Cal. Feb. 21, 2001) (approving parties' agreement in FLSA case

to distribute unclaimed settlement funds to the YMCA, YWCA and Special Olympics); <u>see also</u>

<u>Superior Beverage Co. v. Owens-Illinois</u>, 827 F. Supp. 477, 478-79 (N.D. Ill. 1993) (approving

grants from unclaimed class settlement funds to legal aid bureau, various law school programs, a

museum, a public television station, and other charities); <u>In re Folding Carton Antitrust Litigation</u>, MDL

No. 250, 1991 U.S. Dist. LEXIS 2553, 1991 WL 32867 (N.D. Ill. Mar. 5, 1991) (distributing

unclaimed antitrust class settlement funds to National Association for Public Interest Law for

fellowships unrelated to antitrust law); <u>Lamb v. Wells Fargo Bank, N.A.</u>, Case No. A108354, at 8-12

(Cal. Ct. App. April 11, 2006) (unpublished opinion, attached as **Exhibit E**) ("a finding of

unreasonableness is not compelled merely because objectors can identify fluid recovery which may

provide a *more* direct link to the core purpose of the litigation, for in determining the fairness of the

settlement the trial court is obliged to give due regard to what is otherwise a private consensual

agreement between the parties. The question is whether the settlement, taken as a whole, is 'fair,

reasonable, and adequate' to all concerned under the particular facts of this case.")  <u>Id</u>. at 9-10.

Feldman/Pentz's objections on this issue are entirely frivolous.

**5.**     **Feldman/Pentz Belong to a Family of Repeat "Professional Objectors"**

9

As was the Sckolnick appellant, counsel for Nancy Feldman, John J. Pentz is a repeat objector in class action cases. This Court appears to have recognized such in its approval order (pp. 3-4), as have other judges in this Circuit.

Judge Hornby in the District of Maine stated in In re Compact Disc Antitrust Lit., MDL 1361, 2003 U.S. Dist. LEXIS 25788, at *6 and n.3 (D. Me. 2003):

> I have previously noted that Attorney Pentz representing [Hannah] Feldman filed a groundless objection following the fairness hearing, ... and he appears to be a repeat objector in class action cases. See, e.g., Spark v. MBNA Corp., 48 Fed. Appx. 385, 386 (3d Cir. 2002) (listing Mr. Pentz, from The Objectors Group, as counsel for objectors); Tenuto v. Transworld Sys., 2002 U.S. Dist. LEXIS 1764, 2002 WL 188569 (E.D. Pa. Jan. 31, 2002), at *2 (same).

Some of the many other cases in which Mr. Pentz has objected include Taubenfeld v. Aon Corp., 415 F.3d 597, 598 (7th Cir. 2005) ("[Hannah] Feldman [Mr. Pentz's client] was the lone class member to object to the settlement agreement. She alleged both inadequate notice and excessive fees relative to the level of success achieved by the class." The District Court's award for fees and expenses was affirmed.); In re Warfarin Sodium Antitrust Lit., 212 F.R.D. 231 (D. Del. 2002), aff'd, 391 F.3d 516, 533 (3d Cir. 2004) (District Court affirmed after overruling objection of Pentz's client to 22.5% of common fund settlement being used for attorney's fees); Schwartz v. Citibank, 50 Fed. Appx. 832, 2002 U.S. App. LEXIS 21456 (9th Cir. Sept. 10, 2002) (Pentz objection on behalf of Hannah Feldman-Pentz to attorney's fees of 20% from common fund overruled); Morris v. Lifescan, Inc., 54 Fed. Appx. 663, 2003 U.S. App. LEXIS 820 (9th Cir. Jan. 16, 2003) (Pentz's client's appeal of district court's award of 33-1/3% of the common fund for attorney's fees summarily rejected); Spark v. MBNA Corp., 48 Fed. Appx. 385, 2002 U.S. App. LEXIS 19594 (3d Cir. Sept. 16, 2002) (affirming district court's overruling of Pentz's objections); In re Relafen Antitrust Litig., 231 F.R.D. 52

(D. Mass. 2005) (Judge Young overruled objections filed by Pentz); In re Serzone Products Liability

Litig., 231 F.R.D. 221 (S.D. W.Va. 2005) (Pentz's fee objection overruled); In re PayPal Litig., No.

C-02-1227-JF PVT, 2004 U.S. Dist. LEXIS 22470, 2004 WL 2445244 (N.D. Cal. Oct. 13, 2004)

(Pentz objector where objections to 25% percentage of fee award overruled.); In re Lucent

Technologies, Inc. Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004) (Pentz objector where challenge to

percentage of fund fees of 17% of $517,000,000 class settlement overruled); In re Visa

Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003), aff'd, 396 F. 3d 96

(2d Cir.), cert. denied, 544 U.S. 1044 (2005) (Pentz's objection to 18% percentage of fund fee award

resulting in $220,290,160.44 in fees overruled).

Although Mr. Pentz's objectors generally purport to be acting in the interest of the class, many

are his relatives rather than disinterested class members who decided that the settlements are

objectionable.  Hannah Feldman, the objector in several of the above cases, is Mr. Pentz's wife, who

used to go by the name Hannah Feldman-Pentz.  However, her use of the name Hannah Feldman tends

to conceal that relationship in many of the objections. (**Exhibit F**)  In another case, the objector was

Mr. Pentz's father, also named John Pentz.  Tenuto v. Transworld Sys., No. 99-4228, 2002 U.S. Dist.

LEXIS 1764, 2002 WL 188569, at *2 (E.D. Pa. Jan. 31, 2002).  Nancy Feldman is Mr. Pentz's

mother-in-law.[2]  Mr. Pentz failed to disclose these relationships  –  and his clients' extraneous motives

for objecting  –  to this Court as he did with most of the other courts that have heard his objections.  See

also In re Serzone Prods. Liab. Litig., supra at 228.  (John Pentz represented objector David Pentz).

Mr. Pentz previously called his law firm "The Objectors Group,"  see e.g., Morris v. Lifescan,

---

[2]       This is evident from tracing the persons who lived at the 27 Rosalie Road, Newton,
Massachusetts address given in her objection.  (**Exhibit G**).

Inc., supra.  Yet his objections and appeals not only conceal the true nature of the objectors but are not truly made to advance the interest of the class members.  Mr. Pentz has admitted that "the bulk of his income does not come from court-awarded fees," and that payments from the parties to drop objections "usually dwarf court awards":

> So how does Pentz make a living?  He refuses to generalize, arguing that every case is unique.  But he will acknowledge that the bulk of his income does not come from court-awarded fees. . . . [T]hat kind of fee is the exception rather than the rule, Pentz says.
>
> Instead, objectors make most of their money when class counsel pay them to drop their objections.  Pentz concedes that payments from class counsel usually dwarf court awards.  Joe Whatley of Birmingham-based Whatley Drake, who faced off with Pentz in three different cases, says he has always paid Pentz to drop objections without making changes to the settlement.  "It's like having to pay a tax," Whatley says.

Lerer, "Fringe Player, The Objector, John Pentz, Class Action Fairness Group, Sudbury, Massachusetts," Litigation 2004, a supplement to *The American Lawyer & Corporate Counsel*, Oct. 1, 2004.

Feldman/Pentz's frivolous and illogical objections are a transparent attempt at the same end in this case.  Plaintiff submits that an appeal bond is not only appropriate here, but necessary and important in order to deter this type of misuse of the courts and judicial resources.

## II.     Calculation of Appropriate Amount of Bond.

As stated above, a court may impose a bond to cover damages to the class that result from the delay of the appeal, sanctions under Fed. R. App. P. 38 and 28 U.S.C. § 1927 for filing a frivolous appeal and for other costs under Fed. R. App. P. 39.  This Court should require Feldman/Pentz to post a bond for all these reasons.

The most compelling reason to require a bond is that this baseless appeal will delay a $12.5 million disbursement to the class and cy pres recipients.

Interest on the delayed payment would be substantial.  28 U.S.C. § 1961 provides:

> Interest.
> (a)  Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[.] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.
>
> (b) Interest shall be computed daily to the date of payment ... and shall be compounded annually.

The interest rate on June 14, 2006, the date of judgment, was 5.15%.  **Exhibit H**.  Interest on the $12.5 million judgment for one year (a conservative estimate for the time of an appeal) is calculated according to statute as $643,750.

Aside from the opportunity cost of not having the money sooner, a delay will substantially decrease the chances that settlement checks will reach class members who have changed their residences since submitting claim forms.  An appeal will also require Class Counsel to expend resources in answering calls from class members who are confused as to why they have not received their checks. Other costs associated with the delay include costs of updating and maintaining the website and settlement telephone service.

Appeals take time.  The plaintiff's notice of appeal from the summary judgment order in this case was filed on December 26, 2002, and the Court of Appeals' decision was rendered on June 4, 2004, approximately 17 months later.  If adjudication of Feldman/Pentz's appeal took just one year (two-thirds of the time for the prior appeal in this case), the combined interest that the claimants and cy pres recipients would have lost is $643,750.

As demonstrated *supra*, the Feldman/Pentz appeal is frivolous, and appellees would likely request Rule 38 sanctions.  An appeal such as the one filed by Feldman/Pentz would likely result in attorney's fees in excess of $30,000.  The costs awarded for the appeal earlier in this case amounted to $680.80  (**Exhibit I**, Fed. R. App. P. 39(d) mandate for costs).  Double costs under Rule 38 will likely be appropriate.

The following table shows the calculation of the amount of the bond plaintiff seeks.

| Explanation | Cost |
| --- | --- |
| Interest Damages for Delayed Use of Money from Judgment | $643,750 |
| Attorney's Fees for Appeal | $30,000 |
| Double Costs for Appeal | $1,361.60 |
| **Total** | $675,111.60 |

Therefore, plaintiff requests that this Court enter an order requiring Feldman/Pentz to post a bond in the amount of at least $675,111.60.

**V.    Conclusion**

For the forgoing reasons, plaintiff's motion to require Feldman/Pentz to post bond in the amount of at least $675,111.60 should be granted.

Respectfully submitted,

/s/ Yvonne W. Rosmarin
Yvonne W. Rosmarin  BBO #566428
Law Office of Yvonne W. Rosmarin
58 Medford Street
Arlington, MA 02174
781- 648-4040

Daniel A. Edelman

Cathleen M. Combs
Alexander H. Burke
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor.
Chicago, IL 60603
312-739-4200

# Exhibit A

# 1147

·19·2003   12:59   ELWOOD S. SIMON & ASSOCIATES                          NO.607    P02

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CARDIZEM CD ANTITRUST
LITIGATION,

Master File No. 99-md-1278
MDL No. 1278

THIS DOCUMENT RELATES TO:
Case Nos. 99-75070 (Lightner)
         99-73422 (Betnor)
         99-73412 (Aetna)
         99-73871 (Galloway)
         99-74262 (Aetna)
         99-73667 (Gabriel)
         98-74043 (Zuccanni)
         99-73239 (Aetna)
         99-73845 (Sunshine)
         99-73713 (D'Esposito)
         99-74377 (Glover)
         99-73180 (Sams)
         99-73345 (Sizemore)
         99-73981 (Eirich)
         99-73666 (United Wisc.)
         01-70490 (Ross)
         01-71835 (State of
            New York,
            et al.)

Honorable Nancy G. Edmunds

### CORRECTED ORDER NO. 82
### (CORRECTING CLERICAL ERROR ON PAGE 2 RE: AMOUNT OF BOND AND
### ADDING DATE BOND IS TO BE POSTED ON PAGE 12)

### GRANTING PLAINTIFFS' MOTION FOR IMPOSITION OF AN APPEAL BOND
### UNDER FEDERAL RULE OF APPELLATE PROCEDURE 7

On October 21, 2003, this Court entered final judgment approving the settlement of

Plaintiffs' class action against Defendants   (Order No. 78.)  On November 5, 2003, Ms.

Sams, the sole objector to the settlement, filed a notice of appeal from this Court's order

granting final approval.  Plaintiffs now move this Court for an order requiring Appellant

# 1148

12/19/2003   12:59   ELWOOD S. SIMON & ASSOCIATES                    NO.607   P03

Eugenia Wynne Sams to post an appeal bond, pursuant to Fed. R. App. P. 7, in the amount of $427,743.00. Defendants do not oppose this motion. Ms. Sams opposes Plaintiffs' motion and asserts that an appeal bond, if any, cannot exceed $1,000.00. For the reasons stated below, this Court GRANTS Plaintiffs' motion for imposition of an appeal bond but in a lower amount, $174,429.00.

Ms. Sams' appeal of this Court's decision that the settlement was fair, adequate, and reasonable, as well as consistent with the public interest, is not objectively reasonable, and imposition of a Rule 7 appeal bond that includes administrative costs made necessary by a meritless appeal and a portion of projected attorney fees is appropriate under circumstances where many of the underlying substantive statutes at issue in this nationwide class action settlement include reasonable attorney fees within the definition of recoverable costs.

i.    Facts

In its opinion granting final approval of the class action settlement, this Court carefully considered and rejected Ms. Sams' objections as being meritless and bordering on frivolousness. (Order No. 76 at 40.) To place her objections in context, the Court first examined Ms. Sams' background and her role in this multidistrict litigation. That history and the Court's conclusions are restated here.

> Ms. Sams took Cardizem CD from June 8, 1993 through August 28, 1998. Sams estimates that she paid approximately $35/month for Cardizem CD. As to her Cardizem CD purchases from June of 1993 through December 1997, Sams testified that after she satisfied her $200 medical deductible, her insurer, BCBS, paid 80% of her prescription costs and she was responsible for the remaining 20%. In January 1998, Sams switched insurers, paying only a $15 co-pay. Sometimes she purchased a one-month supply of Cardizem CD, other times she purchased a three-month supply. Sams has

2

# 1149

12/15/2005    12:59    ELWOOD S. SIMON & ASSOCIATES                    NO. 607    P34

5

never taken a generic version of Cardizem CD. (Sams' 1/8/02 Dep. at 16-17, 21, 22-25, 33-34, 36, 42-56, 76-78, 86-93.)

At the fairness hearing and at her deposition, Ms. Sams testified that, after Attorney Ball first contacted her in 1998 and asked her if she took Cardizem, and she agreed to file suit against Defendants, she has not taken an active interest in this litigation. Other than reviewing her initial complaint, gathering her personal paperwork concerning her Cardizem CD purchases, appearing at a deposition requested by Defendant HMRI (now Aventis), Ms. Sams has been content to let her attorney, Mr. Ball, monitor this litigation. (Sams' 1/8/02 Dep. at 67, 71, 73-75.)

Sams' action has never been certified as a class. Accordingly, she represents only herself. Her action, along with the others described above, were transferred to this Court by the Judicial Panel on Multidistrict Litigation in June 1999. Pursuant to this Court's Case Management Orders coordinating pretrial proceedings in all the State Law Actions involved in this multidistrict litigation, Co-Lead Counsel was designated for the State Law Plaintiffs and given responsibility for handling all pretrial litigation, discovery, and settlement negotiations. (Case Management Order Nos. 1-8.) Mr. Ball is not one of the counsel so designated by the Court.

After settlement negotiations began, Mr. Ball filed a motion for a suggestion of a remand on behalf of Ms. Sams, arguing that pretrial proceedings had been completed and a remand was required, or, alternatively, Mr. Ball should be allowed to participate in pretrial settlement negotiations. Mr. Ball's motion was denied. In Order No. 45, this Court observed that Mr. Ball's request was contrary to the procedures set forth in this Court's Case Management Order No. 7, ¶ 14 and would frustrate a recognized purpose for consolidating multidistrict litigation for pretrial proceedings. *See Manual for Complex Litigation (Third)* § 31.132 at 254 (1995) (observing that "[o]ne of the values of multidistrict proceedings is that they bring before a single judge all of the cases, parties, and counsel comprising the litigation" and "therefore afford a unique opportunity for the negotiation of a global settlement. . . . In managing the litigation, therefore, the transferee judge should take appropriate steps to make the most of this opportunity and facilitate the settlement. . . ."). This Court observed that this is an accepted method for creating order out of what would otherwise be chaos if each individual plaintiff's counsel were allowed to engage in uncoordinated discovery and fractured settlement negotiations. *See In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1365 (2d Cir. 1991) (approving the practice of appointing lead counsel for settlement negotiations in complex multidistrict litigation because "[c]ompelling defendants to negotiate with a single negotiator authorized to speak for all the classes eliminates opportunities for divisive settlement shopping", "promotes fair and

3

# 1150

comprehensive resolutions", and "diminishes the costs that multilateral bargaining would impose on each class."). (Order No. 45 filed 10/30/02.)

While settlement negotiations were proceeding, Mr. Ball filed a renewed motion for suggestion of remand on behalf of Ms. Sams. In Order No. 55, this Court denied Mr. Ball's renewed motion, finding that it provided no reason for the Court to depart from the reasoning set forth in Order No. 45. The Court reiterated that coordinated pretrial proceedings were not completed, that Co-Lead Counsel had sole responsibility for pretrial discovery and settlement negotiations, and that this was an accepted method of pretrial management. The Court further observed that, contrary to Sams' arguments, discovery relevant to her claim had been pursued, received, and considered in settlement negotiations between Co-Lead Counsel for the State Law Plaintiffs, the Plaintiff States (including the Attorney General of Tennessee), and Defendants. (Order No. 55 filed 1/29/03.)

Mr. Ball then filed a motion to remand on behalf of Ms. Sams before the Judicial Panel on Multidistrict Litigation ("JPML"). In an Order dated June 17, 2003, the JPML denied Mr. Ball's motion, agreeing with this Court's assessment that a remand of the Sams action would be premature because coordinated pretrial proceedings were ongoing.

Sams' first objection merely reargues the remand issue previously rejected twice by this Court and once by the JPML. The objection does not address the fairness, adequacy, or reasonableness of the Proposed Settlement. Accordingly, it is overruled. The second objection is likewise overruled because it fails to address the fairness, adequacy, and reasonableness of the Proposed Settlement and merely restates a legal argument previously rejected by this Court; i.e., that the Tennessee Attorney General lacks authority to represent Tennessee consumers in this action. (Order No. 68.)

Ms. Sams' final two objections do raise fairness concerns. Both address the Proposed Allocation Plan for disbursement of the Settlement Funds and argue that the distribution formula is not fair because it (1) fails to distinguish between states that allow indirect purchasers to recover antitrust damages and those that do not, and (2) fails to distinguish between Tennessee, which Sams' argues allows recovery for full consideration paid by the consumer, and states that do not allow such recovery. Both objections are overruled.

Class Counsel convincingly argued that the Proposed Allocation Plan is fair, adequate, and reasonable. Distinctions between states' laws were considered during settlement negotiations. It was decided, however, that the Proposed Plan was the best way to get the most cash to consumers. Applying a cost/benefit analysis, it was decided that the increased administration costs necessarily incurred in connection with screening so as

4

## 1151

12/15/2005    12:55    ELWOOD S. SIMON & ASSOCIATES                                    NO.607    P06

to distinguish between consumers of states conferring arguably greater or lesser benefits would result in decreased benefits to consumers. It was also determined that the increased complexity necessarily required on claims forms would decrease the number of consumers taking advantage of this settlement. Settlement always involves a cost/benefit analysis and compromise. This settlement is no different.

Objector Sams does not offer an alternative plan. Moreover, her fairness arguments fail to address the fact that indirect purchaser recovery in Tennessee was not a settled issue at the time the Settlement Agreement was entered into and likewise fail to address the fact that her "full consideration" argument may be more difficult to prove than she portrays. *See Sherwood v. Microsoft Corp*, No. M2000-01850, 2003 WL 21780975 (Tenn. Ct. App. July 31, 2003); *Orlando's Bakery v. Nutrinova Nutrition Specialities & Food Ingredients ("Sorbates Antitrust Litig."*), No. 99-560-11, Slip Op. at 14-15 (20th Judicial Dist., Davidson County, Tenn. Feb. 6, 2002) (Memorandum and Final Order approving proposed settlement and plan of distribution in class action antitrust suit). Ms. Sams' objections also fail to consider the additional litigation risks, expenses and delay avoided by the Proposed Settlement and Allocation Plan. Finally, this Court observes that, despite her complaints, Objector Sams has chosen not to opt-out of the Settlement Class. Rather, she has chosen to object and file an appeal despite knowledge that, pursuant to the Settlement Agreement, an appeal will delay disbursement of Settlement Funds to consumers who are typically elderly and ill and at risk of dying before her appeal is heard or decided.

This Court finds that the overwhelming positive Class response to the Proposed Settlement weighs heavily in favor of approval. *See Kogan*, 193 F.R.D. at 502.

Order No. 76 at 40-44.

Ms. Sams, through her attorney Gordon Ball, filed a notice of appeal challenging this Court's final approval of this class action settlement. This matter is presently before the Court on a motion brought by the Plaintiff States, represented by the Attorneys General of all fifty states, the District of Columbia and Puerto Rico, and Co-Lead Counsel for the State Law Plaintiffs (collectively "Plaintiffs"), for an order requiring Appellant Eugenia Wynne Sams to post an appeal bond, pursuant to Fed. R. App. P 7, in the amount of $427,743.00. Plaintiffs argue that the bond is appropriate because Ms. Sams' meritless

## 1152

12/19/2005   12:59   ELWOOD S. SIMON & ASSOCIATES                NO.697   P87

appeal is the only thing standing between the implementation of the class action settlement

and distribution of tens of millions of dollars to nearly 80,000 consumers, as well as third

party payers and governmental agencies. Without adequate security, Plaintiffs assert, Ms.

Sams' appeal will substantially reduce the settlement amount available to consumers who

tend to be elderly and sick. Plaintiffs present the Court with an affidavit from a retired

senior citizen living on a fixed income who attests that she needs her portion of the

settlement money to help pay for prescription drug costs and that any delay presents a

financial burden. (Shirla McLarty Aff. ¶ 5.) Plaintiffs also present affidavits attesting that

several class members have died while this action was being prosecuted. (Cohen Aff. ¶

3; Novak Aff. ¶ 2.)

### II.   Analysis

Federal Rule of Appellate Procedure 7 provides:

> In a civil case, the district court may require an appellant to file a bond or
> provide other security in any form and amount necessary to ensure payment of
> costs on appeal. . . .

Fed. R. App. P. 7 (emphasis added).[1]  "A district court, familiar with the contours of the

case appealed, has the discretion to impose a bond which reflects its determination of the

likely outcome of the appeal." *Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998) (citing

*Sckoinick v. Harlow*, 820 F.2d 13, 15 (1st Cir. 1987)). "The power to impose an appeal

---

[1] Appeal bonds are distinguishable from *supersedeas* bonds "which [are] available only when a stay has been requested and granted in the district court." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, *1 (D. Me. Oct. 7, 2003). No request has been made for a stay of the Orders at issue in Ms. Sams' appeal.

## 1153

12/19/2003   12:59   ELWOOD S. SIMON & ASSOCIATES                    NO. 687   P03

bond under Rule 7 has been specifically given to the discretion of the district court."
*Adsani*, 139 F.3d at 79 (citing Rule 7, Fed. R. App. P.).

Plaintiffs request an appeal bond in the amount of $427,743.00, broken down as
follows: (1) $1,000.00 for reproduction and other brief preparation costs taxable under
Fed. R. App. P. 39, (2) assuming a 16 month delay attributed to Ms. Sams' appeal,
$276,743.00 in claims administration costs, and (3) $150,000.00 in projected attorney fees
attributable to the appeal. Ms. Sams does not contest Plaintiffs right to $1,000.00 in
appeal costs for reproduction and brief preparation under Rule 7. At issue here are the
second and third components of Plaintiffs' requested appeal bond. Ms. Sams argues that
Fed. R. App. P. 7 does not permit damages caused by the delay incident to appeal or the
recovery of attorney fees in connection with an appeal. This Court disagrees.

Although the Sixth Circuit has not considered whether delay costs or projected
attorney fees may be included in an appeal bond under Rule 7, other Circuit Courts of
Appeal have considered these issues. In recent decisions considering whether potential
attorney fees may be included in a Rule 7 appeal bond, both the Second and Eleventh
Circuit Courts of Appeal have held that such fees may be included if the substantive
underlying statute at issue in the litigation authorizes the recovery of attorney fees as part
of recoverable costs. See *Adsani v. Miller*, 139 F.3d 67 (2d Cir. 1998), *Pedraza v. United
Guar. Corp.*, 313 F.3d 1323 (11th Cir. 2002). Like the Eleventh Circuit in *Pedraza*, this
Court finds the Second Circuit's reasoning and decision in *Adsani* to be persuasive.

The *Adsani* court rejected the plaintiff's argument that "Rule 39 supplies the definition
of 'costs,' as that term is used in Rule 7" and the *Pedraza* court found this analysis to be

7

# 1154

"plainly correct. Under no fair reading of the simple, unambiguous language of Rule 39 can an exportable definition of 'costs' be perceived in the language of that provision." *Pedraza*, 313 F.3d at 1329-30. The Eleventh Circuit found this conclusion persuasive "despite the contrary conclusions of several treatises and the two circuit level decisions other than *Adsani* to address this issue." *Id.* at 1330 (citing *Hirschensohn v. Lawyers Title Ins. Corp.*, No. 96-7312, 118 F.3d 1575 (3d Cir. June 10, 1997); *In re Am. President Lines, Inc.*, 779 F.2d 714, 716 (D.C. Cir. 1985), 20 James Wm. Moore et al., *Moore's Federal Practice* ¶ 307.10[s], at 307-6 (3d ed. 2002); 16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3953, at 293 (3d ed. 1999)). Ms. Sams relies on same contrary authority cited in *Pedraza*. Both the *Pedraza* and *Adsani* courts rejected this contrary authority because neither the *Hirschensohn* nor the *In re Am. President Lines* case "arose in the context of an underlying statute that provides for the shifting of attorneys' fees." *Pedraza*, 313 F.3d at 1330 (citing *Adsani*, 139 F.3d at 73-74).

Rather than defining allowable costs under Rule 7 from Rule 39 of the Fed. R. App. P., "the *Adsani* court determined that the definition of that term (as it is used in Rule 7) should be derived from the statutory fee shifting provision that attends the plaintiff's underlying cause of action. In support of this conclusion, the Second Circuit relied heavily on the Supreme Court's decision in *Marek v Chesny*, 473 U.S. 1, 105 S. Ct. 3012, 87 L.Ed.2d 1 (1985)." *Pedraza*, 313 F.3d at 1331.

In *Marek*, the Supreme Court concluded that costs under Fed. R. Civ. P. 68 included attorney fees. *Id.* The Court observed that, although under the American Rule each party generally pays its own attorney's fees, Congress has the authority to change that rule, and

## 1155

has done so in numerous statutes that permit attorney fees to be awarded as costs. *Id.*
(citing *Marek*, 473 U.S. at 8). The Court further observed that the drafters of Fed. R. Civ.
P. 68 were aware of these statutory exceptions to the American Rule and thus held that
"the term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the
relevant substantive statute or other authority. In other words, all costs properly awardable
in an action are to be considered within the scope of Rule 68 'costs.'" *Id.* at 1331-32
(quoting *Marek*, 473 U.S. at 8-9). The Court elaborated, "absent congressional
expressions to the contrary, where the underlying statute defines 'costs' to include
attorney's fees, we are satisfied such fees are to be included as costs for purposes of Rule
68." *Id.* at 1332 (quoting *Marek*, 473 U.S. at 8-9).

The *Pedraza* court agreed with the *Adsani* court, finding that "Federal Rule of
Appellate Procedure 7 does not differ from Federal Rule of Civil Procedure 68 in any way
that would lead us to adopt a different interpretive approach in this case than was
embraced by the Supreme Court in *Marek*." *Id.* at 1332. In fact, the Eleventh Circuit found
"several substantive and linguistic parallels between Rule 68 and Rule 7" and concluded
that "the reasoning that guided the *Marek* Court's determination that Rule 68 'costs' are to
be defined with reference to the underlying cause of action is equally applicable in the
context of Rule 7." *Id.*

The United States District Court for the District of Maine also recently observed that
the First Circuit allows the inclusion of attorney fees in Rule 7 appeal bonds. *See In re
Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL
22417252, *1 (D. Me. Oct. 7, 2003) (citing *Sckolnick v. Harlow*, 820 F.2d 12 (1st Cir. 1987)

9

# 1156

12/19/2003    12:59    ELWOOD S. SIMON & ASSOCIATES                    NO.607    P11

and *Maher v. Hyde*, 272 F.3d 83, 87 (1st Cir. 2001)). It further observed that, although there is some disagreement among the courts on the issue whether a Rule 7 appeal bond may include costs of delay, in the First Circuit Court of Appeals "a Rule 7 bond can cover damages assessed under Fed. R. App. P. 38. . ."   *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, *1 (comparing *In re Diet Drugs Prods. Liab. Litig.*, MDL 1203, 2000 WL 1665134, **4-5 (E.D. Pa. Nov. 6, 2000) with *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 124, 128 (S.D. N.Y. 1999)). The *Compact Disc* court thus agreed with the decision in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 128, and held "that damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in a Rule 7 bond." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2003 WL 22417252, *1.

The Court finds this authority persuasive. Ms. Sams' reliance on 28 U.S.C. § 1920 for a contrary result is misplaced. As Plaintiffs pointed out in oral argument, § 1920(6) includes compensation for court-appointed experts as taxable costs. In Order No. 59, ¶ 23, this Court appointed Rust Consulting, Inc. to serve as the Settlement Administrator of the Consumer Settlement Fund. Thus, Rust Consulting was appointed as an expert to administer the Settlement Fund.

In light of the above, the Court grants Plaintiffs' motion and will include in the Rule 7 appeal bond projected costs in the amount of $72,099.00 for the initial mailing and any required re-delivery to each of an estimated 80,000 consumer class claimants who have filed a claim registration to inform them that distribution of settlement proceeds has been

10

## 1157

12/19/2005    12:59    ELWOOD S. SIMON & ASSOCIATES                    NO. 687    P12

delayed as a result from Ms. Sams' appeal and to request notification of any change of address that may occur during the delay. (Potter Aff., Ex. 1, p. 1.) Mindful that Plaintiffs have filed a motion for an expedited appeal that Ms. Sams assures the Court she will not oppose (Resp. at 2), this Court will include additional costs of delay attributable to an anticipated 6-month delay for decision on the expedited appeal rather than the 16-month delay projected by Plaintiffs. The additional administrative costs for this 6-month delay total $51,330.00, for a total of $123,429.00. (Potter Aff., Ex. 1.)

Attorney fees are also properly included as costs in the requested Rule 7 appeal bond. Many of the statutes invoked in this litigation contain language that qualifies under the *Adsani* and *Pedraza* test for inclusion of attorney fees as costs. *See, inter alia,* La. Rev. Stat. Ann. Title 51 § 136 (providing that counsel "shall be paid a reasonable attorneys fee, as the court may fix, out of the property of the defendant and this fee taxed as costs of court"); Mass. Gen. Laws ch. 93A, § 4 (allowing recovery of the costs of suit, "including reasonable attorneys' fees"); Minn. Stat. § 325D.57; 10 Me. Rev. Stat. Ann. § 1104; Wis. Stat. § 133.18(1)(a); and N.C. Gen. Stat. § 75-16.1.[2] Mindful of Plaintiffs' motion for an expedited appeal, this Court will include $50,000, a portion of the projected attorney fees, in the Rule 7 appeal bond. (Cohen Aff. ¶ 2.)

---

[2]Ms. Sams' argument that the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-109 (2003) does not allow the recovery of attorney fees fails for a number of reasons. First, it ignores the fact that the substantive law underlying Plaintiffs' litigation involves the substantive laws of all fifty states, the District of Columbia, and Puerto Rico; not just Tennessee. Furthermore, the statutory language cited by Ms. Sams does not apply to the facts presented here. The statutory language she cites permits the court to award damages, reasonable attorney fees and costs to the defendant if the court finds that the plaintiff's private action against the defendant is frivolous, without legal or factual merit, or brought for the purpose of harassment.

11

# 1158

12/19/2003    12:59    ELWOOD S. SIMON & ASSOCIATES                    NO.607    P13

### III.   Conclusion

Taking all circumstances into account, this Court GRANTS Plaintiffs motion for an

appeal bond, but in a lower amount of $174,429.00 reflecting (1) $1,000.00 in filing and

brief preparation costs (Cohen Aff. ¶ 2); (2) $123,429.00 in incremental administration

costs incurred as a result of Ms. Sams' appeal (see Potter Aff., Ex. 1. p. 1); and (3)

$50,000.00 for projected attorneys fees (Cohen Aff. ¶ 2). Ms. Sams is to post her bond by

Monday, January 5, 2004.


Nancy G. Edmunds
U.S. District Judge

Dated:   18 DEC 2003

12

# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CARDIZEM CD ANTITRUST
LITIGATION,

Master File No. 99-md-1278
MDL No. 1278

THIS DOCUMENT RELATES TO:
Case Nos.  99-75070 (Lightner)
           99-73422 (Betnor)
           99-73412 (Aetna)
           99-73871 (Galloway)
           99-74262 (Aetna)
           99-73667 (Gabriel)
           98-74043 (Zuccarini)
           99-73239 (Aetna)
           99-73845 (Sunshine)
           99-73713 (D'Esposito)
           99-74377 (Glover)
           99-73190 (Sams)
           99-73345 (Sizemore)
           99-73981 (Eirich)
           99-73666 (United Wisc.)
           01-70490 (Ross)
           01-71835 (State of
                    New York,
                    et al. )
_____/

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART AND DENYING IN PART (1) ATTORNEY GORDON
BALL'S MOTION FOR A STAY OF EXECUTION OF SEPTEMBER 9, 2005 ORDER
PENDING APPEAL ABSENT BOND, WITH POSTING OF LETTER OF CREDIT, OR
ALTERNATIVELY, WITH POSTING OF A SUPERSEDEAS BOND [873]; AND (2)
PLAINTIFFS' CROSS MOTION FOR A SUPERSEDEAS BOND [876]**

Now before the Court are cross motions, one filed by Attorney Gordon Ball and the

other filed by Plaintiff States[1] and State Law Plaintiffs ("Plaintiffs"), regarding Mr. Ball's

request for a stay and the posting of a supersedeas bond while he appeals this Court's

_____

[1]The Attorneys General of all fifty states, the District of Columbia, and Puerto
Rico.

September 9, 2005 Order. In that Order, this Court determined that Plaintiffs are entitled to $255,683.10 under Fed. R. Civ. P. 54(b) and 28 U.S.C. § 1920(6). This amount reflects the additional costs incurred by the court-appointed expert, Rust Consulting, Inc., for administration of the Class Action Settlement Fund while Attorney Ball pursued his unsuccessful appeals. This Court further determined that Attorney Gordon Ball, rather than his elderly client, should be responsible for payment of the $255,683.10 in light of Attorney Gordon Ball's decision to pursue the appeals without posting a court-ordered appeal bond. This Court GRANTS IN PART and DENIES IN PART the parties' cross-motions concerning the posting of a supersedeas bond.

I.   **Analysis**

Attorney Ball's motion argues for an order staying execution of this Court's September 9, 2005 Order either:  (1) without any supersedeas bond; or (2) with the posting of a letter of credit, in the full amount of $255,683.10, plus interest, and reasonable costs, or a full supersedeas bond.  Plaintiffs do not oppose a stay if Attorney Ball posts a supersedeas bond that sufficiently protects their interests.  Plaintiffs argue that, pursuant to Fed. R. Civ. P. 62(d), this Court should require Attorney Ball to post a supersedeas bond, within 10 days from the date of the order, in the amount of $418,305.33, representing:  (1) the full $255,683.10 owed Plaintiffs; (2) post-judgment interest in the amount of $14,497.23;[2] (3)

---

[2]This sum is based on:  (1) 18 months of post-judgment interest, assuming a time frame similar to the previous appeal in this matter, at 3.78%, as allowed under 28 U.S.C. § 1961.

2

costs in the amount of $625 for copying and postage;[3] (4) $145,000 in attorneys' fees;[4] and

(5) additional charges of $2,500 that will be incurred by Plaintiffs Consumer Fund if the

supersedeas bond is held in that account until March 2007.

This Court agrees with Plaintiffs that Attorney Ball should post a full supersedeas

bond before a stay issues under Rule 62(d).  It disagrees with Plaintiffs, however, as to the

amount of that bond and where it should be deposited.  The Court begins by discussing the

requirement that a full supersedeas bond be posted before a stay is issued.

Pursuant to Rule 62(d) of the Federal Rules of Civil Procedure,[5] if an appeal is

pending, as it is here, a party may obtain a stay on a judgment if a supersedeas bond is

posted.  As expressly stated in Rule 62(d), the stay is "contingent upon the posting of a

court approved supersedeas bond." *Hamlin v. Charter Township of Flint*, 181 F.R.D. 348,

351 (E.D. Mich. 1998).

Rule 62(d) is designed to "preserve[] the status quo while also protecting the

appellee's rights."  *Id.* (citing *Poplar Grove Planting and Refining Co. v. Bache Halsey

Stuart, Inc.*, 600 F.2d 1189, 1190 (5th Cir. 1979)).  "Because of Rule 62(d)'s dual protective

---

[3]This sum is based on the costs incurred in defense of a prior appeal in this matter.

[4]This amount reflects approximately 50% of the attorneys' fees incurred in connection with the prior appeal.

[5]Federal Rule of Civil Procedure 62(d) addresses stays on appeal and provides that:

> When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay . . . .  The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be.  The stay is effective when the supersedeas bond is appeal is approved by the court.

3

role, a full supersedeas bond should almost always be required." *Id.* Absent the appellant's convincing argument that "extraordinary circumstances" exist, the courts generally require that a full supersedeas bond be posted before a stay will issue under Rule 62(d). *Hamlin*, 181 F.R.D. at 353 (citing cases).

Similar to the appellant in *Hamlin*, Attorney Ball argues here that a supersedeas bond is unnecessary because he has the financial resources to pay the $255,683.10 judgment. Such assurances are insufficient to protect the judgment-creditor's interests. As the *Hamlin* Court observed:

> waiving the bond on this factor alone ignores the dual protections Rule 62(d) is designed to provide the appellee. Waiving the bond requirement would deprive [the appellee] of his right to execute the judgment immediately, without providing him the protection to which he is entitled. Rule 62(d)'s bond requirement serves a substantial function in balancing the parties' interest and is not a mere formality that should be waived simply because the losing party has adequate funds to satisfy the judgment. Ideally, losing parties will always have sufficient funds to pay the award, but if this fact alone were enough to waive the bond requirement, the bond requirement would essentially be a nullity.

*Id.* Moreover, to waive a bond based on Attorney Ball's argument that he has the financial resources to pay the $255,683.10 ignores his additional appellate argument that would result in his elderly client, rather than Ball, ultimately being held responsible for that $255,683.10 judgment. There is no assurance from Attorney Ball that his client has the financial resources to pay that Judgment should he lose on his first argument but succeed on the second. This Court is not convinced that it should depart from Rule 62(d)'s requirement that the appellant post a full supersedeas bond before a stay of judgment will issue.

The Court now considers the appropriate amount of the supersedeas bond. The

courts generally require that the amount of the bond include the full amount owed under
the judgment, and anticipated appeal costs, post-judgment interest, and damages for delay
caused by the appeal. *See Poplar Grove Planting*, 600 F.2d at 1191 (citing cases); *Fed.
Deposit Ins. Corp. v. Wysong*, No. G85-482, 1988 U.S. Dist. LEXIS 18136, **3-4 (W.D.
Mich. Jan. 21, 1988). Contrary to Attorney Ball's arguments here, the courts do include
reasonable attorneys' fees for the appeal in the amount of the supersedeas bond. *North
River Ins. Co. v. Greater New York Mut. Ins. Co.*, 895 F. Supp. 83, 84-85 (E.D. Pa. 1995)
(observing that if the appellee "is successful on appeal, it will be entitled to post-judgment
interest and reasonable attorneys' fees expended in preparation of the appeal" and thus
a supersedeas bond that failed to include such amounts was insufficient to protect the
appellee who prevailed in the district court and had a valid, enforceable judgment). *Accord,
Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, NO. CIV.A.00-CV-5481, 2002 WL 922144,
* 3 (E.D. Pa. Apr. 11, 2002), *aff'd in part and rev'd in part on other grounds*, No. 02-2145,
66 Fed. Appx. 398 (3d Cir. May 20, 2003). Accordingly, to adequately afford Plaintiffs
sufficient protection should Attorney Ball's appeal prove to be unsuccessful, this Court
determines that Attorney Ball must post a supersedeas bond in the amount of $320,805.33,
representing:  (1) the full amount of the $255,683.10 judgment; (2) $14,497.23 reflecting
post-judgment interest for 18 months, a similar time frame as that in the prior appeal in this
matter; (3) $625.00 in copying and postage costs; and (4) $50,000 in attorneys' fees.[6]  The
supersedeas bond shall be filed within 10 days of the date of this Order in accordance with

---

[6]This is a reduction from the $145,000 requested by Plaintiffs.  The reduced
amount recognizes that the issue involved in this appeal is far narrower than that
involved in Mr. Ball's earlier appeals.

the procedures followed in the United States District Court for the Eastern District of Michigan.[7]

## II.    Conclusion

For the foregoing reasons, Attorney Ball's and Plaintiffs' cross motions are GRANTED IN PART and DENIED IN PART.

This Court's September 9, 2005 Order shall be stayed if Attorney Ball posts a supersedeas bond in the amount of $320,805.33, pursuant to this Court's direction, within 10 days from the date of this Order.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 10, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 10, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

---

[7]This Court rejects Plaintiffs' request that it require Attorney Ball to deposit the bond amount into an escrow account created in the settlement of the above action. Plaintiffs have not convinced the Court that it should deviate from standard procedures for depositing bond amounts. As a result of this decision, there is no need for the additional charges of $2,500 that Plaintiffs estimated would be incurred by depositing the supersedeas bond in its Consumer Fund escrow account.

# Exhibit C



ENTERED
CLERK, U.S. DISTRICT COURT

DEC - 9 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

FILED
CLERK, U.S DISTRICT COURT

DEC - 5 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

Priority  ✓
Send      ✓
Enter     ✓
Closed    ✓
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In Re BROADCOM CORP.<br>SECURITIES LITIGATION | ) CASE NO. SACV 01-275 DT (MLGx)<br>)<br>) (Consolidated Cases)<br>)<br>) CLASS ACTION<br>)<br>) ORDER **GRANTING** CLASS<br>) PLAINTIFFS' MOTION TO REQUIRE<br>) APPEAL BOND<br>)<br>)<br>) |

DOCKETED ON CM

DEC - 9 2005

BY _____ 001

I.    **Background**

On June 27, 2005, the Honorable Gary Taylor, who presided over this case since its filing, granted preliminary approval of a settlement reached by the parties in this securities fraud class action (the "Settlement"). Obtained on behalf of the Class by the Minnesota State Board of Investment ("Lead Plaintiff"), the Settlement culminates four years of litigation and nearly a year of mediation. On September 14, 2005, this Court entered the Final Judgment and Order of Dismissal.

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

717

1    In accordance with the terms of the Settlement, Defendant Broadcom

2  Corp. ("Broadcom" or "Company") had already paid $108 million into an escrow

3  account.  The remaining $42 million was deposited on September 8, 2005.

4    Currently before this Court is a motion by Class Plaintiffs to require

5  Objector Rinis Travel Services, Inc., Profit Sharing Trust U.A. 6-1-1989 ("Rinis"

6  or "Objector") to post an appeal bond in light of Rinis's appeal of this Court's

7  Judgment.

8    **A.    Factual Summary**

9    The following is a brief summary of this action:

10    On and after March 5, 2001, 31 putative federal securities class action

11  complaints, including <u>Minnesota State Board of Investment v. Broadcom</u>

12  <u>Corporation, et. al.</u>, Case No. 01-04120 ABC (Mcx), were filed against Broadcom

13  Corporation and certain of its then-officers and/or directors.  By order dated May

14  31, 2001, the Honorable Gary L. Taylor consolidated these complaints under the

15  caption <u>In re Broadcom Corporation Securities Litigation</u>, Case No. SA CV 01-

16  275 GLT (MLGx) (the "Class Action"), appointed the Minnesota State Board of

17  Investment as the lead plaintiff (the "Lead Plaintiff"), and appointed Heins, Mills,

18  & Olson PLC as Lead Plaintiffs' counsel.

19    On April 1, 2002, Plaintiffs' Lead Counsel filed a Second

20  Consolidated Amended Complaint for Violation of Securities Exchange Act of

21  1934 (the "Amended Complaint").  The Amended Complaint asserted claims

22  against Broadcom and the Individual Defendants for alleged violations of Sections

23  10(b) and 20(a) of the Securities Exchange Act of 1934 and rule 10b-5

24  promulgated thereunder.  The Amended Complaint sought recovery on behalf of

25  all persons or entities who purchased or otherwise acquired publicly traded

26  securities of Broadcom, or bought or sold options on Broadcom stock, between

27

28                                          2

1  July 31, 2000 and February 26, 2001, and were damaged thereby (the "Class").

2  The Class does not include Defendants; members of the immediate families of the

3  Individual Defendants; officers and directors of Broadcom; Broadcom's parents,

4  subsidiaries, or affiliates; or the legal representatives, heirs, successors, or assigns

5  of such excluded parties.  The Amended Complaint alleged that during the Class

6  Period, Defendants issued false or misleading statements and omitted certain facts

7  concerning certain of Broadcom's acquisitions, accounting for certain warrant

8  agreements in connection with those acquisitions, and Broadcom's current or

9  future financial condition, causing Broadcom's stock price to be artificially

10  inflated.

11  **B.  <u>Procedural Summary</u>**[1]

12  On June 27, 2005, Judge Taylor issued an Order for Preliminary

13  Approval of Class Action Settlement, Approval of Class Notice, and Request for

14  Settlement Hearing.

15  On July 5, 2005, this action was transferred to this Court.

16  On September 12, 2005, this Court granted the following motions: (1)

17  Lead Counsel's Motion for Approval of Lead Counsel's Application for Award of

18  Attorneys' Fees and Reimbursement of Expenses; (2) Class Plaintiffs' Motion for

19  Final Approval of Settlement; and (3) Class Plaintiffs' Motion for Final Approval

20  of Proposed Plan of Allocation.

21  On September 14, 2005, this Court entered the Final Judgment and

22  Order of Dismissal.

23  On October 14, 2005, Objector Rinis filed a Notice of Appeal.

24

25

26

27  [1] This Court sets forth only an abbreviated procedural history.

28  3

On October 25, 2005, Class Plaintiffs filed a Motion to Deny Request for Attorneys' Fees and Expenses by Jacob Sabo, which is currently before this Court.

On this same date, Class Plaintiffs filed a Motion to Require Appeal Bond, which is also currently before this Court.

## II.   Discussion

### A.   Standard

Federal Rule of Appellate Procedure 7 provides that "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7. In applying this rule, "[t]he determination of the amount of a bond necessary to ensure payment of costs on appeal is left to the discretion of the district court." In re Heritage Bond Litig., No. MDL 02-ML-1475 DT (RCX), 2005 WL 2401111, *2 (C.D. Cal. Sept. 12, 2005)("Heritage Bond")(citing Young v. New Process Steel, 419 F.3d 1201, 1203 (11th Cir. 2005)).

### B.   Analysis

Rinis has appealed this Court's final approval of the $150 million settlement ("Settlement") for the shareholder class in this case ("Class") and its benchmark attorneys' fee award of 25%. Lead Plaintiff, on behalf of Class Plaintiffs, moves for an order requiring Rinis to post an appeal bond under Federal Rule of Appellate Procedure 7. It argues that allowing Rinis to appeal without posting a substantial bond would expose the Class to a grave risk that it will not be reimbursed for the enormous expenses imposed by the appeal. More specifically, as examined below, Lead Plaintiff seeks a bond in the amount of $1,240,500 (double the anticipated costs of $620,250).

4

1.  **The bond shall include the costs of copies under Fed. R. App. P. 39(e)**

Lead Plaintiff requests that the Court include in Objector's bond the taxable costs specified by Rule 39(c).

Rule 39(e) provides:

> The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule:
>
> (1) the preparation and transmission of the record;
>
> (2) the reporter's transcript, if needed to determine the appeal;
>
> (3) the premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and
>
> (4) the fee for filing the notice of appeal.

In addition, Rule 39(c) provides in pertinent part:

> Each court of appeals must, by local rule, fix the maximum rate for taxing the cost of producing necessary copies of a brief or appendix, or copies of records authorized by Rule 30(f).

The Class anticipates incurring costs taxable under Rule 39(c) in the approximate amount of $800.00, which is the estimated cost for printing and copying briefs and other submissions.[2] (Williams Decl., ¶ 9.) Such costs are included in appeal bonds, see, e.g., Johnson v. Pac. Lighting Land Co., 878 F.2d 297, 298 (9th Cir. 1989), and Objector Rinis does not oppose this amount. As

---

[2] The costs are based on the limit of 20 cents per page set in 9th Circuit Rule 39-1.3.

5

1   such, this Court finds that the bond amount shall include the costs in the amount of

2   $800.00.

3          **2.     The bond shall include the costs of delay and disruption of**

4                **the settlement administration process**

5           Lead Plaintiff also requests that Objector's appeal bond cover

6   additional costs arising from delay and disruption of administering the Settlement,

7   as it did in Heritage Bond.  It argues that Objector's appeal effectively postpones

8   distribution of the entire judgment for well over a year.  It claims that the Class

9   will incur the following administrative costs of delay: costs of updating addresses

10  and other information needed to remain in contact with Class members, locating

11  lost Class members, sending notices to Class members to apprise them of

12  Objector's appeal and keep them informed about the status of the appeal, paying

13  monthly fees for maintaining the website created to inform Class members, and

14  providing phone support to answer inquiries from the Class members.  These

15  expenses are estimated to be approximately $517,700.  (Gilardi Decl., ¶¶ 6-7 and

16  Exh. A.)

17          This Court has held that the costs of delay are properly included in a

18  Rule 7 bond because "distribution of the settlement proceeds will be unnecessarily

19  delayed until [the] appeal is exhausted."  Heritage Bond, 2005 WL 240111, at *7.

20  "[I]mposition of an appeal bond is necessary to provide some level of security to

21  Lead Plaintiffs who have no assurances that [the appellant] has the financial

22  resources to pay the costs and fees associated with opposing [the] appeal."  Id.  In

23  making this determination, this Court followed the lead of other courts which

24  found it appropriate to require an appeal bond from an appellant in similar

25  circumstances.  See In re Cardizem CD Antritrust Litigation, 391 F.3d 812, 817

26  (6th Cir. 2004)(Court held that "Fed. R. App. P. 39 does not define 'costs' at all;

27

28                            6

1   rather, it merely lists which costs of appeal can be 'taxed' by the district court if it

2   chooses to order one party to pay costs to the other")(citing <u>Adsani v. Miller</u>, 139

3   F.3d 67, 74 (2d Cir. 1998)); <u>In re compact Disc minimum Advertised Price</u>

4   <u>Antitrust Litigation</u>, No. MDL 1361, 2003 WL 22417252, at *1 (D. Me. Oct. 7,

5   2003)(court held that a Rule 7 bond should reflect "damages resulting from delay

6   or disruption to the settlement administration," including "fees to the bank

7   administering the fund, and tracking down claimants who move during the

8   anticipated period . . . until resolution of the appeal); <u>In re NASDAQ Market-</u>

9   <u>Makers Antitrust Litigation</u>, 187 F.R.D. 124 (S.D.N.Y. 1999)(court did not limit

10  the costs covered by a Rule 7 appeal bond to those enumerated in Rule 39(e)).

11      Objector argues that "the predominant position among the courts that

12  have considered the matter is that Rule 7 costs on appeal are strictly limited to

13  costs listed in Rule 39." However, Objector, no doubt for good reason, fails to

14  address this Court's decision in <u>Heritage Bond</u>, as well as the decisions of other

15  court presiding over class settlements that have similarly rejected the narrow

16  interpretation of Rule 7. Objector relies only on <u>In re American President Lines,</u>

17  <u>Inc.</u>, 779 F.2d 714 (D.C. Cir. 1985), a bankruptcy case decided long before the

18  cases which have reasoned that in a class settlement context, a Rule 7 bond may

19  cover fees and expenses resulting from delay or disruption to the settlement

20  administration.

21      Here, Objector's appeal is tantamount to a stay of the judgment

22  approving the class settlement. While Objector did not formally move to stay the

23  Judgment, its appeal effectively imposes a stay, forcing the Class to bear the same

24  risks. Because there is no supersedeas bond to protect the Class from these risks,

25  this Court finds it proper to impose a Rule 7 bond to serve the same purpose.

26  Indeed, Objector's appeal effectively postpones distribution of the entire judgment

27

28                                          7

1   for well over a year. The Class will incur administrative costs of delay, such as

2   those described in the Declaration of Dennis A. Gilardi, the Court-appointed

3   Claims Administrator. (See Gilardi Decl. at ¶¶ 6-7 and Exh. A.) As such, the

4   bond shall include the costs of delay in the amount of $517,700.00.

5        **3.   The bond shall include attorneys' fees that will be incurred**

6             **in defending the appeal**

7              Lead Plaintiff asks the Court to secure payment of attorneys' fees

8   likely to be awarded on appeal. It claims that the fees necessary to oppose the

9   appeals are conservatively estimated to be $100,750. (Williams Decl., ¶ 10.) This

10  estimate includes time for briefing the issues, preparing for oral argument and oral

11  argument. (Id.)

12             As Lead Plaintiff points out, while the Ninth Circuit has not

13  addressed the issue of whether district courts have discretion under Rule 7 to

14  include attorneys' fees in an appeal bond, this Court has previously determined

15  that it has discretion under Rule 7 to include attorneys' fees in an appeal bond.

16  More specifically, this Court determined that a potential Rule 38[3] award is

17  properly considered in determining the amount of an appeal bond. See Heritage

18  Bond, 2005 WL 2401111, at *2 (citing In re NASDAQ Market-Makers Antitrust

19  Litig., 187 F.R.D. 124, 128 (S.D. N.Y. 1999)). In other words, attorneys' fees

20  incurred to defend a frivolous appeal may be included in a Rule 7 bond. Id.

21

22  ─────────────────────

23  [3] Rule 38 provides:
            If a court of appeals determines that an appeal is
24          frivolous, it may, after a separately filed motion or notice
            from the court and reasonable opportunity to respond,
25          award just damages and single or double costs to the
26          appellee.

27  Fed. R. App. P. 38.

28                                8

1    Where the arguments to be made on appeal are frivolous, Rule 38

2  allows the court of appeals to "award just damages and single or double costs to

3  the appellee." Attorneys' fees are one category of "just damages" that may be

4  awarded. See, e.g., Ingle v. Circuit City, 408 F.3d 592, 595 (9th Cir.

5  2005)(imposing double costs and attorneys' fees under Rule 38); Harrah's Club v.

6  Van Blitter, 902 F.2d 774, 777 (9th Cir. 1990)(same). For purposes of Rule 38, an

7  appeal is frivolous if "the result is obvious or the appellant's arguments are wholly

8  without merit." Glanzman v. Uniroyal, Inc., 892 F.2d 58, 61 (9th Cir.

9  1989)(quoting McConnell v. Critchlow, 661 F.2d 116, 118 (9th Cir. 1981)).

10    This Court agrees with Lead Plaintiff that the Ninth Circuit is likely

11  to find that Objector's appeal fits this definition.[4] With respect to Objector's

12  claimed lack of adequate notice, this Court has already found that "[t]here can be

13  no legitimate dispute that the Notice 'apprise[d] interested parties of the pendency

14  of the action and afford[ed] them an opportunity to present their objections."

15  (Final Approval Order at 16-17.)[5] Clearly, notice was forwarded to Objector in

16  ample time to file its objection. Notwithstanding this, contrary to Objector's

17  assertions, the courts have rejected the notion that class counsel has a duty to

18  ensure actual notice to beneficial owners. See Torrisi v. Tuscon Elec. Power Co.,

19  8 F.3d 1370, 1374-75 (9th Cir. 1993)(Ninth Circuit held that the class notice

20  satisfied due process and Rule 23 despite the fact that nearly one-third of the

21

22    [4] Lead Plaintiff states that once the Ninth Circuit affirms the Judgment, it

23  intends to file a motion under Rule 38 to recover the damages suffered by the

24  Class as a result of Objector's unfounded appeal.

25    [5] This Court also notes its discussion in the Order regarding the "canned"

26  nature of Rinis's objection, as the objection was virtually identical to another objection filed in one of the many other cases in which Rinis's collective attorneys

27  have asserted objections. (Order, p. 15.)

28                                  9

1   113,000 class members held their shares in street name and that notice was mailed

2   to some shareholders as late as five days after the deadline for opting out and

3   filing objections). In its Opposition, Objector argues that the Ninth Circuit, not

4   this Court, ultimately will determine under Rule 38 whether the appeal is

5   frivolous. While this is true, this Court has the authority to require a bond

6   reflecting the Ninth Circuit's likely finding that the appeal is frivolous, as

7   explained above.

8           Lead Plaintiff also relies on another statute supporting the inclusion

9   of attorneys' fees in Objector's bond, 28 U.S.C. § 1927, which provides:

10                  Any attorney or other person admitted to conduct cases

11                  in any court of the United States or any Territory thereof

12                  who so multiplies the proceedings in any case

13                  unreasonably and vexatiously may be required by the

14                  court to satisfy personally the excess costs, expenses,

15                  and attorneys' fees reasonably incurred because of such

16                  conduct.

17   28 U.S.C. § 1927. This statute authorizes the Court to impose sanctions against

18   any lawyer who wrongfully proliferates litigation proceedings after a case has

19   commenced. See Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc., 210 F.3d

20   1112 (9th Cir. 2000).

21           A Section 1927 violation requires a finding of subjective bad faith.

22   See B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1107 (9th Cir. 2002). Subjective

23   bad faith "is present when an attorney knowingly or recklessly raises a frivolous

24   argument, or argues a meritorious claim for the purpose of harassing an opponent."

25   In re Keegan Mgmt. Co. Sec. Litig., 78 F.3d 431, 436 (9th Cir. 1996); Gomez v.

26   Vernon, 255 F.3d 1118, 1135 (9th Cir. 2001). However, a finding of bad faith

27

28                                          10

1 "does not require that the legal and factual basis for the action prove totally

2 frivolous." Hart v. Baca, No. CV 01-01866 DDP, 2005 WL 1168422 at *2 (C.D.

3 Cal. May 17, 2005.) Furthermore, Section 1927sanctions have been imposed on

4 professional objectors. See In re Prudential Ins. Co. Am. Sales Practice Litig., 278

5 F.3d 175, 193 (3d Cir. 2002)(affirming Section 1927 sanctions imposed on

6 professional objectors). As such, this Court agrees with Lead Plaintiff that Section

7 1927 also provides a basis for including attorneys' fees in the bond.

8     Thus, the bond shall include Lead Plaintiff's attorneys' fees likely to

9 be awarded on appeal in the amount of $100,750.00.

10     **4.     The bond shall secure double the costs that the Ninth**

11     **Circuit may award**

12     Lead Plaintiff asks the Court to order, as it did in Heritage Bond, that

13 Objector's Rule 7 bond secure payment of double the costs that may be awarded as

14 sanctions for its unfounded appeal. See 2005 WL 2401111, at *7.

15     The Ninth Circuit has used its authority under Rule 38 to impose

16 double costs for a frivolous appeal. See, e.g., Ingle, 408 F.3d at 595(imposing

17 double costs and attorneys' fees under Rule 38); Harrah's Club, 902 F.2d at 777.

18 Here, as discussed above, Rinis' appeal is unfounded. Thus, this Court finds that

19 doubling the costs is appropriate. Doubling the costs of $620,250 increases the

20 proposed bond amount to $1,240,500.

21     **5.     The bond will not include Defendants' expenses**

22     Defendants Broadcom, Henry T. Nicholas, III, Henry Samueli and

23 William J. Ruehle filed a Joinder in Class Plaintiffs' Motion to Require Appeal

24 Bond. They argue that the amount of the bond should cover Defendants'

25 anticipated expenses as well as those of Class Plaintiffs. They claim that they will

26 independently incur costs and attorneys' fees at least equal to the costs and

27

28                                    11

1   attorneys' fees incurred by Class Plaintiffs. In addition, Defendants also ask the

2   Court to double the costs and attorneys' fees, increasing the bond amount to cover

3   Defendants' estimated expenses to $203,100.

4          This Court finds it unnecessary to include Defendants' expenses in

5   the bond amount. The amount set by the Court, as detailed above, is sufficient.

6   This is especially true in light of the fact that the Court doubled Plaintiffs' costs

7   and attorneys' fees, and Defendants contend that their costs and attorneys' fees

8   would be at least equal to Class Plaintiffs'.

9      **B.**   **Conclusion**

10         Accordingly, this Court **grants** Class Plaintiffs' Motion to Require

11  Appeal Bond. Objector Rinis Travel Service, Inc., Profit Sharing Trust U.A. 6-1-

12  1989 is ordered to post a bond in the amount of $1,240,500 within 10 court days

13  upon entry of this Order.

14

15         IT IS SO ORDERED.

16

17  DATED: 12/5/05

18

         DICKRAN TEVRIZIAN
         Dickran Tevrizian, Judge
         United States District Court

19

20

21

22

23

24

25

26

27

28

# Exhibit D

ORIGINAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES - MOTIONS

Scan only

Case No.  02-ML-1475-DT                    Date: Sept. 12, 2005
     Consolidated with Case No(s): CV 01-5752-DT; CV 02-382-DT; CV 02-993-DT;
CV 02-2745-DT; CV 02-6484-DT; CV 02-6841-DT; CV 02-9221
Companion Case: CV 02-6512-DT
Title:  __IN RE HERITAGE BOND LITIGATION_____

===========================================================================

PRESENT:   THE HONORABLE DICKRAN TEVRIZIAN, JUDGE
           D.L. O'Neill for
           Valencia R. Vallery                 Lori Muraoka____
           Courtroom Deputy                    Court Recorder

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:
Brian Barry/Christopher Wong           Gary Kurtz/Matthew Miller
                                       Scott Dreher/Steven Bacon
                                       Kimberly Howatt/Steve Skirvin
                                       Daniel Harkins/Bradd Milove by phone

PROCEEDINGS: (1) Bank of New York's motion for dismissal (CV-02-2745-DT)
             (2) Lead Plaintiffs' motion for the imposition of an appeal bond pursuant
to Federal Rule of Appellate Procedure 7 from MMK and/or Hermann and Rothblatt (CV-02-382-DT)
             (3) Lead Plaintiffs' motion for imposition of an appeal bond pursuant to
Federal Rule of Appellate Procedure 7 from Bruce Talley; Joinder by defendants John M. Clarey &
Kenneth E. Dawkins; Joinder by Kasirer defendants

  Hearing held on the above-referenced matter. The Court orders the motion:


    X  Granted as to motions #:_1,2 and3_____.


    X  OTHER:__The Court signs and files orders as to all 3 motions.__

MINUTES FORM 11                    Initials of Deputy Clerk_rw↓vkv



1451

Exhibit E

Filed 4/11/06  Lamb v. Wells Fargo Bank CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION 3

| | |
|---|---|
| KENDRA LAMB,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>        Defendant and Respondent,<br><br>FRED SONDHEIMER,<br><br>        Objector and Appellant. | A108354<br><br>(San Francisco County<br>  Super. Ct. No. 306149) |
| KENDRA LAMB,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>        Defendant and Respondent,<br><br>ANDREA CHIANG, et al.,<br><br>        Objectors and Appellants. | A108355<br><br>(San Francisco County<br>  Super. Ct. No. 306149) |

In these consolidated appeals, Andrea Chiang, et al., (Chiang ) and Fred Sondheimer (Sondheimer) contend the trial court erred by approving the settlement agreement reached in a class action brought against Wells Fargo Bank, N.A. (Wells Fargo).  Sondheimer also challenges the attorney fee award approved by the trial court under the settlement agreement.  We affirm.  The trial court did not abuse its discretion in

1

determining that the settlement agreement was fair, adequate, and reasonable, or in determining that the attorney fee request was appropriate.

## BACKGROUND

In September 1999, Kendra Lamb and others filed a class action alleging Wells Fargo sold or disclosed its customers' confidential financial information without their informed consent. The First Amended Complaint filed in July 2000 alleges causes of action for invasion of privacy, unjust enrichment, violation of Civil Code sections 2223 and 2224, and violation of Business and Professions Code section 17200. Plaintiffs sought to enjoin Wells Fargo from selling or disclosing personal financial information absent a customer's written and informed consent, restitution and disgorgement of monies obtained by Wells Fargo from the sale of personal information to third parties, general and punitive damages, and attorney fees. In July 2001, the trial court certified a class consisting of "all persons who are or have been defendant Wells Fargo Bank, N.A.'s customers whose personal financial information was disclosed and/or sold to third parties without said customers' prior informed consent during the period [Class Period] September 3, 1995, through the present."

In December 2003, the parties filed a Notice of Joint Motion and Motion for Preliminary Approval of Class Action Settlement announcing that they had reached a full and final settlement of the action. The parties agreed to expand the class definition for settlement purposes to create a "Plaintiff Settlement Class" defined as all persons (1) who during the Class Period were (a) checking or savings account customers of Wells Fargo and/or (b) California residents who held a credit card issued by Wells Fargo or any affiliate, and (2) whose personal financial information was disclosed and/or sold to third parties without such persons' prior informed consent. The Settlement Agreement provided for a "Common Fund" with an aggregate worth of approximately $9,575,000, as well as injunctive relief. Wells Fargo agreed to pay a "Settlement Fund" of $3,250,000, amounting to around 33.9 per cent of the Common Fund, to be distributed to a variety of

2

registered charitable organizations throughout California.[1]  Wells Fargo further agreed to

provide free services to class members in the form of one-month's participation in its on-

line bill-paying service at no cost, then available to its customers at the rate of $6.95 per

month.  Class members who were already using the pay-bill service would automatically

receive one-month's free service, and other class members would receive three months of

free participation upon enrollment in the service instead of the two months then offered

by Wells Fargo to new enrollees.  Such services and related costs were valued at

approximately $3,500,000, representing around 36.6 per cent of the Common Fund.

Also, Wells Fargo agreed to a request for attorney fees not exceeding $2.825 million

subject to approval by the trial court (representing approximately 29.5 per cent of the

Common Fund), with any amount of the $2.825 million not approved to be added to the

charitable distribution and not returned to Wells Fargo.  In addition, Wells Fargo agreed

to pay the costs of administering the settlement, including the costs of giving notice to the

settlement class.  As to injunctive relief, Wells Fargo agreed to maintain in effect for a

period of two years from the date the court preliminarily approved the settlement an

existing policy of not sharing customer information with unaffiliated parties for the

purposes of marketing non-financial products.

On December 18, 2003, the trial court entered its Preliminary Approval Order.  In

the order, the trial court stated it had received "unrebutted evidence that Wells Fargo does

not maintain records of the identities of the members of the Plaintiff Settlement Class;

that it would be impracticable, if not impossible, to find addresses for such individuals;

and that the cost of undertaking searches necessary to identify those individuals would be

prohibitive."  Elizabeth Hoople, Senior Vice President of Wells Fargo Card Services,

---

[1]      In support of the motion for final approval of settlement, Tim Hanlon, senior vice
president of Wells Fargo and President of the Wells Fargo Foundation, declared under
oath: (1) the various regions served by Wells Fargo are permitted to designate charitable
contributions to qualified non-profit groups in their respective communities up to two per
cent of the net after tax income in their regions; and, (2) these budgets will not be reduced
as a result of the settlement, but instead an additional $3.25 million in funds will be
donated to charities as a direct result of this settlement.

declared under oath in support of the settlement agreement: "Wells Fargo Card Services cannot identify which customers' information was shared with third parties, nor can Wells Fargo Card Services identify the extent to which customer information was shared. Wells Fargo Card Services did not retain this information; nor did it have the infrastructure in place to retain this information. I am unaware of any means by which the identities of credit or debit customers affected by information sharing can be determined. Nor am I aware of means to identify more generally the percentage of customers affected by information sharing."

The preliminary approval order required Wells Fargo to provide notice of the terms of settlement to all known members of the Plaintiff Settlement Class by April 1, 2004, including instructions on how to object to, or opt out of, the settlement. Notices were sent to all consumer checking and savings account customers of Wells Fargo Bank as of November 1, 2003, who have addresses in the United States and received a periodic monthly statement, as well as all credit card customers of Wells Fargo Bank Nevada, N.A., as of November 1, 2003, with addresses in California. In addition, Wells Fargo made one publication of the Notice Announcement in a weekday edition of the Wall Street Journal and USA Today. All in all, class notices were mailed to 5.7 million Wells Fargo customers. The notices generated 90 individual objections to, and 196 requests for exclusion from, the settlement agreement. In addition, the First Amendment Project, counsel here for appellants-objectors Chiang et al., filed objection on behalf of another 78 named individuals. After a hearing on August 23, 2004, the trial court found the settlement to be fair, reasonable, and adequate, but set a continued hearing on the matter of attorney fees and ordered counsel to provide more detailed documentation and declarations on that issue. At the subsequent hearing on September 22, 2004, the trial court found counsel had made an adequate showing that the lodestar amount was appropriate, that a multiplier of 1.43 was also appropriate, and approved attorney fees as requested in the amount of $2,825,000.

## DISCUSSION

### A. *Applicability of Section 384*

The Chiang Objectors contend the settlement agreement should be set aside because the trial court failed to comply with the statutory requirements of Code of Civil Procedure section 384.[2] Section 384 was enacted to ensure that "the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." (§ 384, subd. (a).) It requires that before entry of judgment in a class action, the trial court must determine the total amount that will be paid to class members, set a date when the parties must report the *actual* amount paid to class members, and "amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment, to nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives and purposes of the underlying cause of action, to child advocacy programs, or to nonprofit organizations providing civil legal services to the indigent." (§ 384, subd. (b).) The trial court found section 384 inapplicable because there was no residual amount for distribution under the settlement agreement.

Whether section 384 governs this settlement agreement presents a question of statutory interpretation which we review de novo. (*In re Vitamin Cases* (2003) 107 Cal.App.4th 820, 826.) In *In re Vitamin Cases*, the trial court approved the settlement of a class action suit on behalf of all purchasers of vitamins in California alleging price fixing against seven manufacturers of vitamin products. The settlement awarded the entire recovery to charitable and nonprofit organizations and did not allow class members to make individual claims. (*Id.* at p. 823.) On appeal, four class members argued section

---

[2]     Unless otherwise noted, all further statutory references are to the Code of Civil Procedure.

384 precludes such an award if class members have not first been given the chance to obtain a share of the settlement. (*Id.* at p. 826.)

The Court of Appeal noted that "section 384 uniformly indicates an intent to address distribution of residue[,] . . . [t]hus the procedure established by section 384 applies when there exists an undistributed residue, for example, when the class award allows for distribution to class members and yet settlement or judgment funds remain after that procedure is completed." (*In re Vitamin Cases*, supra, 107 Cal.App.4th at p. 828.)  The court explained the rationale for "the heightened concern" regarding the distribution of an unclaimed residue as follows: "The purpose of class notice in the context of a settlement is to give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. [citation]  When distribution of a settlement fund or a judgment following trial does not consume the entire fund or award and the settlement agreement or judgment does not describe the intended disposition of the residue, the class members will have no means of objecting to the later adoption of a distribution method.  Section 384 fills that gap by requiring that the court ensure that the residue is directed to an appropriate nonprofit organization or foundation.  In contrast, a settlement such as the one here will not produce a residue whose distribution was not explained to the class. The Consumer Class members will be fully informed of the nature of the intended distribution and afforded an opportunity to opt out or object. Accordingly, the rights of the Consumer Class members do not need the judicial protection provided by section 384." (*Id.* at pp. 828-29.)

Similarly, in *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, Charles Jakob appealed the trial court's final approval of a billion dollar settlement agreement reached in consolidated class actions against Microsoft after the trial court rejected his objection to the settlement agreement's provision for a distribution of unclaimed settlement funds to eligible public schools in the form of vouchers for computer equipment and software. (*Ibid.*) Jakob contended that the provision was illegal because section 384 applies to "any judgment in a class action" and that a trial court is required in *all* class actions to

6

order the distribution of any unclaimed residue to one or more of the entities specified under section 384 subdivision (b), which did not include the eligible public schools designated as the residual beneficiaries under the settlement agreement. (*Id.* at p. 717.) The court stated, however, that the phrase "any judgment" in section 384 subdivision (b) did not mean "*every* judgment or *all* judgments entered in a class action." *Id.* at p. 718. Instead, the court concluded that the phrase "is limited by its context to refer to a judgment that awards some form of direct compensation to plaintiff class members, yet requires subsequent amendment because it does not itself provide for the calculation and distribution of any unpaid residue of the direct compensation." (*Id.* at p. 722.) Accordingly, the court held the trial court did not err when it refused to apply section 384 to the judgment at issue. (*Ibid.*)

Under the terms of the settlement agreement in this case, Wells Fargo agreed to provide a Common Fund of payments and services worth approximately $9,575,000. The distribution consumed the entire Common Fund in its allocation of direct benefits to class members by means of a month's free use of Wells Fargo's on-line bill paying service, worth approximately $3,500,000[3], a distribution to charitable organizations in the exact amount of $3,250,000, and an allowable amount for attorney fees in the amount of $2.85 million. The only possibility of unclaimed funds was if the court did not approve attorney fees in the full amount of $2.85 million, and in that event the settlement agreement provided any residue would be added to the charitable distribution and not revert to Wells Fargo. In sum, the settlement agreement generated no unpaid residuals implicating the provisions of section 384, and class members were fully informed on the details of the intended distribution and given the opportunity to object or opt out. Thus,

---

[3]     This value is computed as the sum of: (1) lost revenue of approximately $2.6 million from existing Wells Fargo customers using online bill pay services, and; (2) if 2.5 per cent of the 5.7 million customers who received the Notice of Settlement take advantage of the benefit then 142,500 new customers will receive one month's free service at $6.95 per month, equaling approximately $990,375. Zimmerman, Executive Vice-President of the Consumer Deposits Group for Wells Fargo, stated the 2.5 per cent estimate is conservative given the increasing popularity of on-line billing.

as in *In re Vitamins Cases, supra,* 107 Cal.App.4th 820 and *In re Microsoft I-V Cases, supra,* 135 Cal.App.4th 706, we conclude that the trial court did not err by refusing to apply section 384 to the judgment in this case.

### B. *Fairness Determination*

Regardless of the applicability of section 384, the trial court must still examine the settlement agreement and approve it only after finding that it is "fair, adequate, and reasonable." (*In re Microsoft I-V Cases, supra,* 135 Cal.App.4th at p. 723.) We accord the trial court "broad discretion" in determining whether a class action settlement is fair, and will only disturb that settlement on appeal if the record shows a "clear abuse" of such broad discretion. (*Dunk v. Ford Motor Company* (1996) 48 Cal.App.4th 1794, 1801-02; *7-Eleven Owners For Fair Franchising v. Southland Corporation* (2000) 85 Cal.App.4th 1135, 1146 ["To merit reversal, both an abuse of discretion by the trial court must be 'clear' and the demonstration of it on appeal must be 'strong.' "].) Moreover, a presumption of fairness obtains where, as here, there is no dispute that the settlement was reached through arm's length bargaining, investigation and discovery were sufficient to allow counsel and the court to act intelligently, counsel is experienced in similar litigation, and the percentage of objectors is small. (*Dunk, supra,* at p. 1802.)

The Chiang Objectors contend the trial court should not have approved the settlement because the Settlement Agreement's "*cy près* provision," directing $3.25 million to charitable organizations, does not benefit the class and is unrelated to the purposes and principles underlying the litigation. In a similar vein, Sondheim argues the settlement violates "*cy près* doctrine" because there is an insufficient nexus between the recipient charitable organizations and the purpose of the litigation.

As part of the Settlement Agreement in this case, Wells Fargo agreed to pay a Settlement Fund in the amount of $3.25 million to a "*cy pres* trust" for disbursement to an agreed list of charities. We note the doctrine of *cy pres* "originated in the [common] law of charitable trusts. Where compliance with the literal terms of a charitable trust became impossible, the funds would be put to 'the next best use,' in accord with the

8

dominant charitable purposes of the donor." (*State of California v. Levi Strauss & Co.* (*Levi Strauss*) (1986) 41 Cal.3d 460, 472.)  In *Levi Strauss*, the Supreme Court recognized, however, the equitable principles of *cy pres* may be applied to "special problems in consumer class actions," such as damage distribution where "[e]ach individual's recovery may be too small to make traditional methods of proof worthwhile." (*Id.* at p. 471-472.)  "In the class action context," the Supreme Court stated, "the *cy pres* doctrine is generally denominated 'fluid recovery.'" (*Id.* at p. 472.)

In any given case, the "propriety of fluid recovery depends upon its usefulness in fulfilling the purposes of the underlying cause of action." (*Levi Strauss, supra,* 41 Cal.3d at p. 472.)  Indeed, the Supreme Court stated: "Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. [citation]  Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts." (*Ibid.*)

The principal thrust of appellants' argument is that the central purpose of the lawsuit was to combat the invasion of privacy involved in any misuse by Wells Fargo of its customers' information, so the fluid recovery should have borne a closer nexus to that purpose, by targeting, for example, organizations concerned with promoting consumer privacy.  However, it must be remembered that "whether a fluid recovery will sufficiently further" the purposes of the litigation depends upon "the facts of the particular case under consideration." (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 130.)  Moreover, a finding of unreasonableness is not compelled merely because objectors can identify fluid recovery which may provide a *more* direct link to the core purpose of the litigation, for in determining the fairness of the settlement the trial court is obliged to give due regard "to what is otherwise a private consensual agreement between the parties." (*Dunk, supra,* 48 Cal.App.4th at p. 1801; *see also In re Microsoft I-V Cases, supra,* 135 Cal.App.4th at p. 724 [noting that the trial court's focus "is not so much whether another type of distribution might be better, but the extent to which the distribution, *as proposed*, is appropriately useful in fulfilling the purposes of the underlying cause of action"].)  The

9

question is whether "the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned" under the particular facts of this case. (*Dunk, supra*, 48 Cal.App.4th at p. 1801.)

We are mindful of the authorities provided by appellants which stand for the proposition that a *cy près* distribution will be reversed if it is not sufficiently tailored to the nature of the underlying lawsuit. (*See In re Airline Ticket Commission Antitrust Litigation*, 307 F.3d 679 (8th Cir. 2002) and *Kansas Assn. of Private Investigators v. Mulvihill*, 159 S.W.3d 857 (Mo. Ct. App. 2005)  In *Airline Ticket Commission*, the Eighth Circuit reversed the district court's *cy près* award to the National Association of Public Interest Law in a class action suit by travel agents against airlines concerning caps on commissions paid to travel agents because "travel agencies in Puerto Rico and U.S. Virgin Islands were clearly the next best recipients of the funds." (*Airline Ticket Commission, supra*, 307 F.3d at p. 683.) In *Kansas Assn. of Private Investigators*, the court held the trial court's *cy près* distribution of the residue, from a class action by private investigators against the Board of Police Commissioners for overpayment of fees, to charities benefiting children, was improper because the charities, although worthwhile, were not related to law enforcement activities. *Kansas Assn. of Private Investigators, supra*, 159 S.W.3d at p. 861. We note in both cases the trial court independently determined the next best use of unclaimed residual funds from a class action under principles of *cy pres*. Here though, the trial court did not independently determine the distribution of a residual from the settlement applying *cy pres* principles, but instead reviewed for fairness a settlement agreement presented by the parties (which included in part a fluid recovery), giving "[d]ue regard . . . to the private consensual agreement between the parties." (*Dunk, supra*, 48 Cal.App.4th at p. 1801.) It is to the fairness and adequacy of that settlement we now turn, and review the trial court's decision under an abuse of discretion standard.

The settlement provided a combination of direct benefits to certain class members, injunctive relief, and a fluid recovery designed to broadly benefit the class as a whole in a case where individual damages could not be identified, far less proven. The trial court

10

was presented with unrebutted evidence Wells Fargo was unable to identify those of its
customers whose information was shared with third parties, or the extent to which such
information may have been shared. Nor was Wells Fargo even able to estimate what
percentage of its customers were subjected to information sharing. In addition, the trial
court observed that the nature of the claimed injury in this case is somewhat imprecise,
and might run from minor irritation, to being offended at the idea that Wells Fargo had
used one's information without permission, to having one's evening disrupted by a
telemarketer. We might also observe that some customers may have suffered the injury
of uninformed disclosure of their personal information, but may have suffered no
resulting injury because they willingly took advantage of services offered by a soliciting
third party. The trial court noted as well, "what you have here is a random cross-section
of people. You don't have all the folks who shop at Sears, for example, or all the folks
who buy medicine of a particular type. You have essentially everybody from any level of
society that dealt with Wells Fargo Bank, which is a full range of people . . . [¶] . . .
suffering . . . an inchoate range of injuries." Under these facts, the trial court found the
geographically and functionally diverse range of charities named in the fluid recovery
would benefit the class as a whole.

　　Furthermore, the fluid recovery here ensures important policies of both
disgorgement and deterrence are realized. (*Levi Strauss, supra,* 41 Cal.3d at p. 472.)
Also, such disgorgement furthers "the purposes of the underlying causes of action,"
(*ibid.*) which here included causes of action for unjust enrichment, violation of Civil
Code sections 2223 and 2224, and violation of Business Code section 17200. Nor does
the fact that the fluid recovery provides an indirect benefit to the class as a whole
undercut the fairness of the settlement. (*In re Microsoft Cases, supra,* 135 Cal.App.4th at
pp. 726-727 [concluding that the trial court did not abuse its discretion in determining
that a distribution of computer vouchers to public schools provided indirect compensation
to class members by helping to train a new generation that will be computer literate when
it enters the workplace].)

We do not say fluid recovery to a broad range of charities would be acceptable in every class action settlement solely because it served policies of disgorgement and deterrence. Clearly, any settlement must benefit the class in whose name it is struck. In this case, we are somewhat troubled by the decidedly indirect nature of the benefit provided to class members. However, in the unusual circumstances presented here, where class members and the nature of their injuries are almost impossible to ascertain, and where the fluid recovery was not a true pour-over residual but benefited a representative group of the bank's customers, we conclude the trial court did not abuse its broad discretion in approving as fair and adequate the settlement agreement containing the charitable distribution at issue.

## C. Other Issues

Sondheimer raises a number of other issues. First, he asserts the entire Common Fund could have been distributed to Wells Fargo account holders and that "the parties never made a showing why the *cy près* distribution was necessary." However, as noted above, the trial court was reviewing the fairness of the settlement agreement presented to it, not one preferred by Sondheimer. There was no abuse of discretion by the trial court on this count. (*See In re Microsoft Cases, supra,* 135 Cal.App.4th at p. 724 [noting that the objector cited no authority explicitly imposing on the trial court a duty to compare a settlement agreement's proposed fluid recovery with other possible distributions when assessing the fairness of that agreement]; *In re Vitamin Cases, supra,* 107 Cal.App.4th at p. 832 [approving settlement agreement where class members received *no direct individual benefit* and entire distribution was in the form of a charitable fluid recovery].)

Next, Sondheimer asserts there was a failure of judicial oversight because in approving the settlement the trial court refused to require each recipient charity to file a report with the court stating how the fluid recovery funds were actually spent. Sondheimer suggests this was necessary to somehow protect the class fund from fraud and misuse, and asks us to take judicial notice of the declaration of Francis Scarpulla (filed in another class action in San Francisco Superior Court) because it illustrates that

12

such a reporting requirement is neither burdensome nor novel.  We decline to take notice

of the Scarpulla declaration[4] because the record indicates the charitable organizations

included in the distribution of the fluid recovery were selected because they had well-

established track records of addressing the needs of their representative segments of the

community, and the trial court did not abuse its discretion in assuming that such charities

would utilize the funds according to their charitable mission.

Sondheimer also characterizes the settlement agreement as dividing the class into

two subclasses, with one subclass (class members who are currently on-line bill pay

customers) receiving 100 per cent of its benefits, and the other subgroup (class members

who are not currently on-line bill pay customers), receiving only 2.5 per cent of its

benefits.  This, he asserts, renders the settlement unfair.[5]  However, the 2.5 per cent

figure was only an estimate of the percentage of class members who were not currently

on-line bill pay customers who would actually enroll to gain the benefit of an additional

---

[4]      In his Motion to Take Judicial Notice, filed on March 4, 2005, Sondheimer asks
that we also take judicial notice of a hearing concerning the approval of attorney fees in
another class action presided over by the same trial judge in this case.  Disposition of this
appeal does not require judicial notice of the documents referenced in the Motion to Take
Judicial Notice.  Thus, the motion is denied.

[5]      The cases cited by Sondheimer on this issue are inapposite.  In *Amchem Products,
Inc. v. Windsor* (1997) 521 U.S. 591, the U.S. Supreme Court denied certification of a
class for settlement purposes in an asbestos litigation case because the class did not
satisfy "the requirements of common issue predominance and adequacy of
representation" under Rule 23 of the of Federal Rules of Civil Procedure.  (*Id.* at p. 628).
*Mirfasihi v. Fleet Mortgage Corporation* (7th Cir. 2004) 356 F.3d 781, involved a class
action by 1.6 million mortgagees against Fleet Mortgage Company for the unauthorized
sharing of their financial information with telemarketers:  The suit involved two plaintiff
classes—an information-sharing class of 1.4 million, and a telemarketing class of
190,000—and under the settlement the information class received "absolutely nothing"
whereas members of the telemarketing class could receive payments ranging from $10 to
$135 for each transaction with a telemarketer.  (*Id.* at pp. 782-783).  The court reversed
the district court's approval of the settlement agreement because it failed to discuss the
settlement's "questionable features," viz., denial of relief to an entire class, reversion of
unclaimed funds to the putative wrongdoer, and lack of separate counsel for the class
denied all relief.  (*Id.* at p. 785.)  The settlement before us contains no such features.

month's free service—the settlement agreement actually placed no limit on how many class members could avail themselves of the offer. In any event, uncertainty about the percentage of the class who would redeem the offer does not render the settlement unfair. (*See Dunk, supra*, 48 Cal.App.4th at pp. 1804-1805; *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 247 (*Wershba*).) In sum, the trial court did not abuse its discretion in approving the settlement even though some class members automatically received the one month's free on-line bill pay service and other class members had first to enroll in the service in order to obtain the benefit.[6]

### D. *Attorney Fees*

Sondheimer contends the attorney fee award was improper. He faults the trial court for merely "approving" the award as within the realm of reason instead of "setting" the award. Also, he states a multiplier should not have been awarded to class counsel.

"The applicable substantive law is that an award of attorney fees in class action litigation must be tied to counsel's actual efforts to benefit the class." (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1142.) "[F]ees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award." (*Dunk, supra*, 48 Cal.App.4th at p. 1809.) The trial court is not required to provide specific findings reflecting its calculations and the record "need only show that the attorney fees were awarded according to the 'lodestar' or 'touchstone' approach." (*Wershba, supra*, 91 Cal.App.4th at p. 254.) We review the trial court's fee determination for abuse of discretion. (*Id.* at p. 255.)

Here, the record reflects the trial court employed the lodestar method in deciding whether to award attorney fees. The trial court held two hearings on this issue, and at the

---

[6]     Sondheimer also suggests sound public policy should forbid broad charitable awards under fluid recovery. However, such public policy arguments are better addressed to the Legislature, not this court. (*See, e.g., Shapiro v. Board of Directors of Centre City Development Corp.* (2005) 134 Cal.App.4th 170, 185 [stating that public policy arguments for striking a different balance between local agency efficiency and local agency openness are better directed to the Legislature].)

first hearing required class counsel to provide more precise information on how the lodestar amount was calculated. At the second hearing, the trial court acknowledged calculation of the lodestar was complicated because there were no contemporaneous time records. The trial court judge concluded, based on his independent review of the court file, his first-hand knowledge of the case, his personal experience, and the supplemental information provided by counsel, that class counsel had appropriately demonstrated the lodestar amount. The trial court's methodology was entirely appropriate, and we find no abuse of discretion. (*See Wershba, supra,* 91 Cal.App.4th at p. 255 [noting that "California case law permits fee awards in the absence of detailed time sheets," and that "[a]n experienced trial judge is in a position to assess the value of the professional services rendered in his or her court"].) In addition, the trial court judge explained that in selecting a multiplier he considered the risk involved in bringing suit, the time invested by counsel, and the acceptable result obtained by counsel. The trial court also considered the multiplier awarded in similar cases before deciding on a multiplier of 1.43. Again, we find no abuse of discretion in that determination. (*See ibid.* [noting that "[m]ultipliers can range from 2 to 4 or even higher].)

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal.

_____
Parrilli, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.

15

Exhibit F

MIDDLESEX COUNTY, MA 43 KENDALL RD, SUDBURY, MA 01776-2609

5 of 5 DOCUMENTS

**\*\*\* THIS DATA IS FOR INFORMATION PURPOSES ONLY \*\*\***

**PROPERTY RECORD FOR** MIDDLESEX COUNTY, MA

**ESTIMATED ROLL CERTIFICATION DATE** JANUARY 1, 2001

**Owner:** PENTZ, JOHN J; **FELDMAN PENTZ,** HANNAH ETUX; Owner Occupied

**Mailing Address:** 43 KENDALL RD, SUDBURY, MA 01776

**Property Address:** 43 KENDALL RD, SUDBURY, MA 01776-2609

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* SALES INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Recorded Date:** 10/01/2001

**Sale Price:** $ 423,000 (Full Amount)

**Book/Page:** 33740/144

Prior Sales Date: 06/20/1997

Prior Sales Price: $ 260,000 (Full Amount)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* ASSESSMENT INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Assessor's Parcel Number:** H-05-00583.

**Legal Description:** DISTRICT: 288; CITY: SUDBURY; CENSUS TRACT: 3652.01

**Land Use:** 1-FAMILY RESIDENCE

**Assessment Year:** 2001

**Total Assessed Value:** $ 294,000

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* TAX INFORMATION \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Tax Amount:** $ 4,575.00

**Tax Year:** 2001

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* PROPERTY CHARACTERISTICS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | | |
|---|---|---|---|
| Year Built: | 1962 | No. of Buildings: | 1 |
| Stories: | 1 | Style: | |
| Units: | 1 | Air Conditioning: | |
| Bedrooms: | 3 | Heating: | Forced Air Unit |
| Baths: | 3.00 | Construction: | |
| Partial Baths: | | Basement: | Yes |
| Total Rooms: | 8 | Exterior Walls: | Wood Siding |
| Fireplace: | 1 | Foundation: | |
| Garage Type: | Attached | Roof: | Shingle (Not Wood) |
| Garage Size: | 1 Car(s) | Elevator: | |

MIDDLESEX COUNTY, MA 43 KENDALL RD, SUDBURY, MA 01776-2609

Pool/Spa:

Lot Size:          30056 SF
Building Area:     2116

FELDMAN, HANNAH L

20 of 109 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-SRCH

**Name: FELDMAN, HANNAH L**



**Address:**
27 ROSALIE RD
NEWTON, MA 02459
Address Created: 2/2000

**Previous Addresses:**
717 BOSTON POST RD
SUDBURY, MA 01776
Address Created: 3/1998


146 WAVERLEY ST
BELMONT, MA 02478
Address Created: 10/1994

FELDMAN, HANNAH L

37 of 109 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-TRAK

Name: **FELDMAN, HANNAH L**

Also Known As:
  **FELDMAN, HANNAH; PENTZ, H**



Address:
  39 HARNESS LN
  SUDBURY, MA 01776-1520
  Address Updated: 5/21/2004

Previous Addresses:
  717 BOSTON POST RD
  SUDBURY, MA 01776-3328
  Address Updated: 8/1/1997


  27 ROSALIE RD
  NEWTON CENTER, MA 02459-3128
  Address Updated: 7/13/2001


  27 ROSALIE RD
  SUDBURY, MA 02159
  Address Updated: 5/1/1997


  13 DANIELS ST
  SALEM, MA 01970-5214
  Address Updated: 11/13/2000


  6 DAY ST APT. A
  CAMBRIDGE, MA 02140-1204
  Address Updated: 7/18/2001


  146 WAVERLEY ST
  BELMONT, MA 02478-1932
  Address Updated: 7/18/2001



FELDMAN, HANNAH L

**On File Since:** 10/1/1985

Exhibit G

70 of 109 DOCUMENTS

**THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY**

PERSON LOCATOR - P-CNSR

Copyright 2003 infoUSA Inc., All Rights Reserved.

**Name:** FELDMAN, DONALD Rev (MALE)

**Additional Names:**
  **FELDMAN, HANNAH L (FEMALE), 3/1964**
  FELDMAN, SARAH L (FEMALE), 9/1967

**Spouse Name:** FELDMAN, NANCY O (FEMALE), 12/1937

**Address:**
  27 ROSALIE RD
  NEWTON CENTER, MA 02459-3128
  County: MIDDLESEX
  Latitude: 42.30
  Longitude: -71.19
  Address Type: HOUSE NUMBER & STREET NAME
  Address Created: 1975

**Birthdate:** 9/1928

**Telephone:** (617) 332-5977

**Telephone Type:** VOICE LINE

# Exhibit H

HOME    CONTACT US    SITE INDEX    FAQ    FOIA    ESPAÑOL    ACCESSIBILITY    PRIVACY & LEGAL

INTEREST RATE STATISTICS

## Daily Treasury Yield Curve Rates

Current Data

 This data is also available in XML format by clicking on the XML icon



Daily Treasury
Yield Curve Rates

Daily Treasury
Long-Term Rates

Daily Treasury
Real Yield Curve
Rates

Daily Treasury
Real Long-Term
Rates

Weekly Aa
Corporate Bond
Index

**Starting January 2006**

| Date | 1 mo | 3 mo | 6 mo | 1 yr | 2 yr | 3 yr | 5 yr | 7 yr | 10 yr | 20 yr | 30 yr |
|------|------|------|------|------|------|------|------|------|-------|-------|-------|
| 01/03/06 | 4.05 | 4.16 | 4.40 | 4.38 | 4.34 | 4.30 | 4.30 | 4.32 | 4.37 | 4.62 | N/A |
| 01/04/06 | 4.03 | 4.19 | 4.37 | 4.35 | 4.31 | 4.28 | 4.28 | 4.31 | 4.36 | 4.60 | N/A |
| 01/05/06 | 4.05 | 4.20 | 4.37 | 4.36 | 4.32 | 4.29 | 4.29 | 4.31 | 4.36 | 4.61 | N/A |
| 01/06/06 | 4.06 | 4.22 | 4.39 | 4.38 | 4.36 | 4.32 | 4.32 | 4.33 | 4.38 | 4.63 | N/A |
| 01/09/06 | 4.09 | 4.23 | 4.40 | 4.39 | 4.36 | 4.32 | 4.32 | 4.34 | 4.38 | 4.63 | N/A |
| 01/10/06 | 4.15 | 4.29 | 4.42 | 4.42 | 4.41 | 4.36 | 4.36 | 4.38 | 4.43 | 4.68 | N/A |
| 01/11/06 | 4.16 | 4.30 | 4.45 | 4.44 | 4.44 | 4.39 | 4.39 | 4.41 | 4.46 | 4.70 | N/A |
| 01/12/06 | 4.16 | 4.32 | 4.43 | 4.42 | 4.39 | 4.35 | 4.35 | 4.37 | 4.42 | 4.66 | N/A |
| 01/13/06 | 4.13 | 4.33 | 4.43 | 4.40 | 4.34 | 4.29 | 4.28 | 4.30 | 4.36 | 4.59 | N/A |
| 01/17/06 | 4.11 | 4.38 | 4.47 | 4.42 | 4.33 | 4.28 | 4.27 | 4.29 | 4.34 | 4.57 | N/A |
| 01/18/06 | 4.04 | 4.35 | 4.46 | 4.42 | 4.33 | 4.29 | 4.28 | 4.30 | 4.34 | 4.58 | N/A |
| 01/19/06 | 3.98 | 4.35 | 4.47 | 4.43 | 4.37 | 4.32 | 4.31 | 4.33 | 4.38 | 4.61 | N/A |
| 01/20/06 | 3.95 | 4.35 | 4.48 | 4.44 | 4.37 | 4.32 | 4.31 | 4.32 | 4.37 | 4.59 | N/A |
| 01/23/06 | 3.98 | 4.38 | 4.50 | 4.45 | 4.35 | 4.31 | 4.30 | 4.31 | 4.36 | 4.59 | N/A |
| 01/24/06 | 4.24 | 4.40 | 4.51 | 4.46 | 4.37 | 4.33 | 4.32 | 4.34 | 4.40 | 4.63 | N/A |
| 01/25/06 | 4.22 | 4.42 | 4.54 | 4.51 | 4.46 | 4.41 | 4.41 | 4.43 | 4.49 | 4.72 | N/A |
| 01/26/06 | 4.17 | 4.45 | 4.54 | 4.52 | 4.49 | 4.45 | 4.44 | 4.46 | 4.53 | 4.76 | N/A |
| 01/27/06 | 4.19 | 4.45 | 4.55 | 4.54 | 4.51 | 4.46 | 4.45 | 4.47 | 4.52 | 4.75 | N/A |
| 01/30/06 | 4.18 | 4.48 | 4.62 | 4.59 | 4.52 | 4.47 | 4.46 | 4.49 | 4.54 | 4.77 | N/A |
| 01/31/06 | 4.37 | 4.47 | 4.59 | 4.58 | 4.54 | 4.49 | 4.47 | 4.49 | 4.53 | 4.74 | N/A |
| 02/01/06 | 4.33 | 4.47 | 4.60 | 4.60 | 4.59 | 4.54 | 4.51 | 4.52 | 4.57 | 4.77 | N/A |
| 02/02/06 | 4.32 | 4.48 | 4.62 | 4.61 | 4.59 | 4.54 | 4.51 | 4.53 | 4.57 | 4.76 | N/A |
| 02/03/06 | 4.31 | 4.48 | 4.63 | 4.62 | 4.59 | 4.54 | 4.50 | 4.51 | 4.54 | 4.70 | N/A |
| 02/06/06 | 4.32 | 4.48 | 4.68 | 4.66 | 4.62 | 4.57 | 4.51 | 4.52 | 4.55 | 4.69 | N/A |
| 02/07/06 | 4.33 | 4.49 | 4.67 | 4.65 | 4.61 | 4.57 | 4.52 | 4.54 | 4.57 | 4.73 | N/A |
| 02/08/06 | 4.34 | 4.50 | 4.67 | 4.66 | 4.64 | 4.61 | 4.55 | 4.55 | 4.56 | 4.75 | N/A |
| 02/09/06 | 4.32 | 4.52 | 4.67 | 4.66 | 4.66 | 4.62 | 4.55 | 4.55 | 4.54 | 4.72 | 4.51 |
| 02/10/06 | 4.36 | 4.53 | 4.70 | 4.70 | 4.69 | 4.67 | 4.59 | 4.59 | 4.59 | 4.76 | 4.55 |
| 02/13/06 | 4.38 | 4.55 | 4.71 | 4.70 | 4.68 | 4.66 | 4.58 | 4.58 | 4.58 | 4.76 | 4.56 |
| 02/14/06 | 4.42 | 4.55 | 4.72 | 4.71 | 4.69 | 4.68 | 4.61 | 4.61 | 4.62 | 4.80 | 4.60 |
| 02/15/06 | 4.39 | 4.55 | 4.70 | 4.70 | 4.71 | 4.68 | 4.60 | 4.60 | 4.61 | 4.78 | 4.58 |
| 02/16/06 | 4.38 | 4.55 | 4.69 | 4.69 | 4.69 | 4.67 | 4.59 | 4.59 | 4.59 | 4.77 | 4.57 |
| 02/17/06 | 4.39 | 4.54 | 4.69 | 4.68 | 4.66 | 4.64 | 4.55 | 4.54 | 4.54 | 4.71 | 4.51 |
| 02/21/06 | 4.42 | 4.56 | 4.73 | 4.73 | 4.71 | 4.68 | 4.59 | 4.58 | 4.57 | 4.72 | 4.53 |
| 02/22/06 | 4.44 | 4.57 | 4.70 | 4.69 | 4.68 | 4.66 | 4.57 | 4.55 | 4.53 | 4.68 | 4.48 |

| Date | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/23/06 | 4.44 | 4.59 | 4.73 | 4.73 | 4.72 | 4.70 | 4.63 | 4.58 | 4.56 | 4.70 | 4.51 |
| 02/24/06 | 4.45 | 4.60 | 4.73 | 4.73 | 4.74 | 4.70 | 4.64 | 4.60 | 4.58 | 4.71 | 4.52 |
| 02/27/06 | 4.48 | 4.62 | 4.76 | 4.76 | 4.74 | 4.71 | 4.66 | 4.61 | 4.59 | 4.74 | 4.55 |
| 02/28/06 | 4.47 | 4.62 | 4.74 | 4.73 | 4.69 | 4.67 | 4.61 | 4.57 | 4.55 | 4.70 | 4.51 |
| 03/01/06 | 4.45 | 4.60 | 4.75 | 4.74 | 4.71 | 4.68 | 4.63 | 4.60 | 4.59 | 4.74 | 4.56 |
| 03/02/06 | 4.45 | 4.62 | 4.75 | 4.74 | 4.72 | 4.72 | 4.68 | 4.66 | 4.64 | 4.80 | 4.62 |
| 03/03/06 | 4.45 | 4.62 | 4.75 | 4.75 | 4.76 | 4.75 | 4.71 | 4.69 | 4.68 | 4.84 | 4.66 |
| 03/06/06 | 4.44 | 4.60 | 4.77 | 4.77 | 4.77 | 4.77 | 4.76 | 4.74 | 4.74 | 4.91 | 4.72 |
| 03/07/06 | 4.47 | 4.60 | 4.77 | 4.77 | 4.77 | 4.79 | 4.76 | 4.75 | 4.74 | 4.91 | 4.72 |
| 03/08/06 | 4.45 | 4.58 | 4.77 | 4.76 | 4.72 | 4.77 | 4.75 | 4.74 | 4.73 | 4.91 | 4.72 |
| 03/09/06 | 4.44 | 4.60 | 4.77 | 4.76 | 4.72 | 4.77 | 4.75 | 4.74 | 4.74 | 4.91 | 4.72 |
| 03/10/06 | 4.46 | 4.62 | 4.78 | 4.77 | 4.74 | 4.80 | 4.77 | 4.76 | 4.76 | 4.93 | 4.74 |
| 03/13/06 | 4.45 | 4.61 | 4.83 | 4.80 | 4.74 | 4.81 | 4.78 | 4.78 | 4.77 | 4.95 | 4.77 |
| 03/14/06 | 4.49 | 4.59 | 4.80 | 4.75 | 4.66 | 4.72 | 4.68 | 4.69 | 4.71 | 4.89 | 4.71 |
| 03/15/06 | 4.50 | 4.63 | 4.81 | 4.77 | 4.69 | 4.72 | 4.69 | 4.70 | 4.73 | 4.93 | 4.75 |
| 03/16/06 | 4.49 | 4.62 | 4.77 | 4.72 | 4.62 | 4.62 | 4.60 | 4.61 | 4.65 | 4.86 | 4.70 |
| 03/17/06 | 4.50 | 4.64 | 4.78 | 4.74 | 4.65 | 4.64 | 4.62 | 4.63 | 4.68 | 4.89 | 4.72 |
| 03/20/06 | 4.56 | 4.66 | 4.79 | 4.74 | 4.65 | 4.62 | 4.61 | 4.62 | 4.66 | 4.87 | 4.70 |
| 03/21/06 | 4.67 | 4.69 | 4.82 | 4.79 | 4.72 | 4.71 | 4.68 | 4.69 | 4.71 | 4.91 | 4.74 |
| 03/22/06 | 4.67 | 4.69 | 4.81 | 4.78 | 4.74 | 4.72 | 4.69 | 4.70 | 4.70 | 4.91 | 4.73 |
| 03/23/06 | 4.66 | 4.67 | 4.81 | 4.80 | 4.77 | 4.74 | 4.73 | 4.73 | 4.73 | 4.93 | 4.75 |
| 03/24/06 | 4.66 | 4.65 | 4.78 | 4.76 | 4.72 | 4.67 | 4.66 | 4.66 | 4.67 | 4.87 | 4.70 |
| 03/27/06 | 4.66 | 4.63 | 4.80 | 4.77 | 4.72 | 4.69 | 4.69 | 4.69 | 4.70 | 4.91 | 4.73 |
| 03/28/06 | 4.71 | 4.65 | 4.83 | 4.82 | 4.81 | 4.79 | 4.79 | 4.79 | 4.79 | 4.98 | 4.80 |
| 03/29/06 | 4.69 | 4.63 | 4.83 | 4.83 | 4.82 | 4.81 | 4.79 | 4.79 | 4.81 | 5.02 | 4.84 |
| 03/30/06 | 4.67 | 4.61 | 4.84 | 4.84 | 4.84 | 4.84 | 4.83 | 4.83 | 4.86 | 5.07 | 4.89 |
| 03/31/06 | 4.65 | 4.63 | 4.81 | 4.82 | 4.82 | 4.83 | 4.82 | 4.83 | 4.86 | 5.07 | 4.90 |
| 04/03/06 | 4.66 | 4.67 | 4.86 | 4.86 | 4.86 | 4.85 | 4.85 | 4.86 | 4.88 | 5.08 | 4.90 |
| 04/04/06 | 4.64 | 4.68 | 4.85 | 4.85 | 4.84 | 4.83 | 4.82 | 4.84 | 4.87 | 5.09 | 4.91 |
| 04/05/06 | 4.62 | 4.67 | 4.83 | 4.82 | 4.81 | 4.79 | 4.79 | 4.80 | 4.84 | 5.07 | 4.90 |
| 04/06/06 | 4.65 | 4.68 | 4.85 | 4.85 | 4.84 | 4.83 | 4.84 | 4.86 | 4.90 | 5.13 | 4.96 |
| 04/07/06 | 4.64 | 4.69 | 4.85 | 4.86 | 4.89 | 4.89 | 4.89 | 4.92 | 4.97 | 5.20 | 5.04 |
| 04/10/06 | 4.64 | 4.69 | 4.89 | 4.89 | 4.89 | 4.89 | 4.89 | 4.92 | 4.97 | 5.21 | 5.04 |
| 04/11/06 | 4.63 | 4.70 | 4.88 | 4.88 | 4.88 | 4.86 | 4.86 | 4.88 | 4.93 | 5.17 | 5.00 |
| 04/12/06 | 4.62 | 4.70 | 4.91 | 4.91 | 4.91 | 4.90 | 4.91 | 4.93 | 4.98 | 5.22 | 5.05 |
| 04/13/06 | 4.54 | 4.70 | 4.94 | 4.95 | 4.96 | 4.96 | 4.97 | 5.00 | 5.05 | 5.28 | 5.11 |
| 04/17/06 | 4.55 | 4.72 | 4.93 | 4.93 | 4.91 | 4.91 | 4.93 | 4.96 | 5.01 | 5.25 | 5.08 |
| 04/18/06 | 4.54 | 4.72 | 4.90 | 4.88 | 4.84 | 4.86 | 4.87 | 4.92 | 4.99 | 5.23 | 5.07 |
| 04/19/06 | 4.54 | 4.73 | 4.90 | 4.89 | 4.86 | 4.87 | 4.91 | 4.96 | 5.04 | 5.29 | 5.13 |
| 04/20/06 | 4.55 | 4.73 | 4.90 | 4.90 | 4.89 | 4.89 | 4.92 | 4.97 | 5.04 | 5.29 | 5.14 |
| 04/21/06 | 4.58 | 4.75 | 4.90 | 4.90 | 4.90 | 4.89 | 4.92 | 4.95 | 5.01 | 5.25 | 5.10 |
| 04/24/06 | 4.58 | 4.75 | 4.93 | 4.92 | 4.89 | 4.88 | 4.90 | 4.94 | 4.99 | 5.22 | 5.07 |
| 04/25/06 | 4.63 | 4.79 | 4.96 | 4.95 | 4.95 | 4.94 | 4.98 | 5.02 | 5.07 | 5.31 | 5.16 |
| 04/26/06 | 4.65 | 4.79 | 4.98 | 4.98 | 4.99 | 4.99 | 5.02 | 5.06 | 5.12 | 5.34 | 5.18 |

| 04/27/06 | 4.64 | 4.78 | 4.93 | 4.93 | 4.91 | 4.92 | 4.95 | 5.00 | 5.09 | 5.32 | 5.18 |
| 04/28/06 | 4.60 | 4.77 | 4.91 | 4.90 | 4.87 | 4.87 | 4.92 | 4.98 | 5.07 | 5.31 | 5.17 |
| 05/01/06 | 4.61 | 4.82 | 4.98 | 4.97 | 4.94 | 4.95 | 4.99 | 5.04 | 5.14 | 5.38 | 5.23 |
| 05/02/06 | 4.66 | 4.81 | 4.98 | 4.96 | 4.92 | 4.94 | 4.98 | 5.03 | 5.12 | 5.35 | 5.20 |
| 05/03/06 | 4.65 | 4.82 | 5.00 | 4.98 | 4.94 | 4.96 | 5.01 | 5.06 | 5.15 | 5.38 | 5.24 |
| 05/04/06 | 4.61 | 4.80 | 5.01 | 5.00 | 4.97 | 4.99 | 5.03 | 5.08 | 5.16 | 5.38 | 5.23 |
| 05/05/06 | 4.61 | 4.83 | 5.00 | 4.98 | 4.94 | 4.96 | 4.99 | 5.03 | 5.12 | 5.35 | 5.20 |
| 05/08/06 | 4.64 | 4.87 | 5.03 | 5.01 | 4.97 | 4.99 | 5.01 | 5.05 | 5.12 | 5.34 | 5.19 |
| 05/09/06 | 4.72 | 4.88 | 5.03 | 5.01 | 4.97 | 4.98 | 5.01 | 5.05 | 5.13 | 5.35 | 5.20 |
| 05/10/06 | 4.69 | 4.88 | 5.03 | 5.02 | 5.01 | 5.00 | 5.03 | 5.06 | 5.13 | 5.34 | 5.19 |
| 05/11/06 | 4.64 | 4.82 | 4.99 | 4.99 | 4.99 | 5.01 | 5.04 | 5.07 | 5.14 | 5.38 | 5.23 |
| 05/12/06 | 4.64 | 4.85 | 5.00 | 5.00 | 5.01 | 5.03 | 5.08 | 5.12 | 5.19 | 5.44 | 5.29 |
| 05/15/06 | 4.68 | 4.86 | 5.02 | 5.01 | 4.99 | 5.01 | 5.04 | 5.08 | 5.15 | 5.41 | 5.26 |
| 05/16/06 | 4.76 | 4.83 | 4.99 | 4.98 | 4.96 | 4.97 | 4.99 | 5.03 | 5.10 | 5.36 | 5.22 |
| 05/17/06 | 4.75 | 4.83 | 5.00 | 4.99 | 4.97 | 5.00 | 5.03 | 5.08 | 5.16 | 5.42 | 5.28 |
| 05/18/06 | 4.75 | 4.83 | 4.98 | 4.96 | 4.94 | 4.94 | 4.96 | 5.00 | 5.08 | 5.32 | 5.18 |
| 05/19/06 | 4.75 | 4.82 | 5.00 | 4.98 | 4.96 | 4.95 | 4.96 | 4.98 | 5.05 | 5.28 | 5.14 |
| 05/22/06 | 4.74 | 4.83 | 5.02 | 4.99 | 4.94 | 4.94 | 4.94 | 4.96 | 5.04 | 5.28 | 5.13 |
| 05/23/06 | 4.75 | 4.84 | 5.02 | 5.00 | 4.97 | 4.97 | 4.98 | 5.00 | 5.07 | 5.30 | 5.16 |
| 05/24/06 | 4.74 | 4.82 | 4.99 | 4.97 | 4.94 | 4.92 | 4.93 | 4.96 | 5.03 | 5.27 | 5.13 |
| 05/25/06 | 4.74 | 4.82 | 5.01 | 5.00 | 4.98 | 4.97 | 4.97 | 4.99 | 5.07 | 5.31 | 5.17 |
| 05/26/06 | 4.75 | 4.84 | 5.02 | 5.00 | 4.96 | 4.94 | 4.95 | 4.97 | 5.06 | 5.30 | 5.16 |
| 05/30/06 | 4.76 | 4.84 | 5.04 | 5.02 | 4.99 | 4.99 | 4.99 | 5.01 | 5.09 | 5.33 | 5.19 |
| 05/31/06 | 4.75 | 4.86 | 5.08 | 5.07 | 5.04 | 5.03 | 5.04 | 5.06 | 5.12 | 5.35 | 5.21 |
| 06/01/06 | 4.75 | 4.83 | 5.06 | 5.05 | 5.04 | 5.02 | 5.03 | 5.05 | 5.11 | 5.34 | 5.20 |
| 06/02/06 | 4.75 | 4.81 | 5.01 | 4.98 | 4.92 | 4.91 | 4.90 | 4.92 | 5.00 | 5.24 | 5.10 |
| 06/05/06 | 4.77 | 4.85 | 5.04 | 5.02 | 4.99 | 4.95 | 4.95 | 4.97 | 5.02 | 5.24 | 5.10 |
| 06/06/06 | 4.80 | 4.86 | 5.05 | 5.03 | 4.99 | 4.96 | 4.95 | 4.96 | 5.01 | 5.22 | 5.08 |
| 06/07/06 | 4.80 | 4.86 | 5.06 | 5.05 | 5.02 | 4.99 | 4.97 | 4.98 | 5.02 | 5.23 | 5.09 |
| 06/08/06 | 4.78 | 4.87 | 5.06 | 5.04 | 5.01 | 4.97 | 4.95 | 4.96 | 5.00 | 5.20 | 5.06 |
| 06/09/06 | 4.78 | 4.88 | 5.07 | 5.05 | 5.01 | 4.96 | 4.95 | 4.95 | 4.98 | 5.17 | 5.03 |
| 06/12/06 | 4.78 | 4.93 | 5.13 | 5.09 | 5.02 | 4.97 | 4.95 | 4.96 | 4.99 | 5.17 | 5.03 |
| 06/13/06 | 4.72 | 4.89 | 5.13 | 5.09 | 5.02 | 4.96 | 4.93 | 4.94 | 4.97 | 5.15 | 5.01 |
| 06/14/06 | 4.68 | 4.90 | 5.17 | (5.15) | 5.11 | 5.06 | 5.03 | 5.04 | 5.05 | 5.23 | 5.09 |
| 06/15/06 | 4.60 | 4.85 | 5.16 | 5.15 | 5.14 | 5.10 | 5.08 | 5.08 | 5.10 | 5.27 | 5.13 |
| 06/16/06 | 4.63 | 4.88 | 5.19 | 5.18 | 5.16 | 5.13 | 5.10 | 5.10 | 5.13 | 5.31 | 5.17 |
| 06/19/06 | 4.67 | 4.93 | 5.25 | 5.23 | 5.19 | 5.15 | 5.12 | 5.13 | 5.14 | 5.32 | 5.18 |
| 06/20/06 | 4.70 | 4.92 | 5.24 | 5.23 | 5.19 | 5.16 | 5.13 | 5.14 | 5.15 | 5.33 | 5.19 |
| 06/21/06 | 4.66 | 4.92 | 5.23 | 5.22 | 5.20 | 5.16 | 5.14 | 5.14 | 5.16 | 5.32 | 5.19 |
| 06/22/06 | 4.55 | 4.92 | 5.24 | 5.24 | 5.23 | 5.21 | 5.18 | 5.18 | 5.20 | 5.37 | 5.23 |
| 06/23/06 | 4.61 | 4.98 | 5.27 | 5.27 | 5.27 | 5.23 | 5.21 | 5.21 | 5.23 | 5.40 | 5.26 |
| 06/26/06 | 4.73 | 5.03 | 5.32 | 5.30 | 5.27 | 5.25 | 5.22 | 5.23 | 5.25 | 5.42 | 5.28 |
| 06/27/06 | 4.86 | 5.05 | 5.31 | 5.28 | 5.24 | 5.22 | 5.19 | 5.20 | 5.21 | 5.38 | 5.24 |
| 06/28/06 | 4.79 | 5.01 | 5.31 | 5.30 | 5.29 | 5.26 | 5.23 | 5.23 | 5.25 | 5.42 | 5.28 |

| 06/29/06 | 4.68 | 5.01 | 5.26 | 5.25 | 5.21 | 5.19 | 5.17 | 5.18 | 5.22 | 5.39 | 5.26 |
| 06/30/06 | 4.54 | 5.01 | 5.24 | 5.21 | 5.16 | 5.13 | 5.10 | 5.11 | 5.15 | 5.31 | 5.19 |

Back To Top

**For Historical data prior to 1990 please see link below:**

http://federalreserve.gov/releases/h15/data.htm

# Exhibit I

# United States Court of Appeals
## For the First Circuit

No. 03-1027

DEBORAH J. BARNES

Plaintiff - Appellant

v.

FLEET NATIONAL BANK, N.A.; FLEETBOSTON FINANCIAL CORPORATION

Defendants - Appellees

TAXATION OF COSTS

**Entered: July 13, 2004**

Costs in favor of **appellant** is taxed as follows:

Docket Fee ...............$ <u>100.00</u>

Reproduction of brief ...............$ <u>267.30</u>

Reproduction of reply brief ...............$ <u>97.10</u>

Reproduction of appendix ...............$ <u>216.40</u>

TOTAL ...............$ <u>680.80</u>

Pursuant to Fed. R. App. P. 39(d)(3), the district court is directed to add this taxation of costs to the mandate issued on June 23, 2004.

By the Court:
Richard Cushing Donovan, Clerk

MARK R. SYSKA

By: _____
Chief Deputy Clerk

[Certified Copies to: Hon. Nancy Gertner and Tony Anastas, Clerk]

[cc: Yvonne W. Rosmarin, Esq., Cathleen M. Combs, Esq., Anne M. Burton, Esq., Daniel A. Edelman, Esq., James O. Latturner, Esq., Jon E. Hayden, Esq., Alan S. Kaplinsky, Esq., Joseph L. Kociubes, Esq., Rheba Rutkowski, Esq., Terry Klein, Esq.]